**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SOUTHWEST AIRLINES CO., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 3:21-cv-00098 |
| | § | |
| KIWI.COM, INC., and KIWI.COM S.R.O., | § | |
| | § | |
| | § | |
| *Defendants*. | § | |

**DEFENDANT KIWI.COM, INC.'S BRIEF IN SUPPORT OF MOTION TO DISMISS FOR IMPROPER VENUE**

## TABLE OF CONTENTS

Index of Authorities ........ iii

Introduction ........ 1

Standards Governing This Motion ........ 3

Argument ........ 4

I. The Statutorily Proper Venue for This Action Is Not the Northern District of Texas ........ 4

II. The Forum-Selection Provision of Southwest's Website Terms & Conditions Does Not Mandate Venue in the Northern District ........ 10

Conclusion ........ 13

Certificate of Service ........ 15

# INDEX OF AUTHORITIES

## CASES

*Barnett v. Dyncorp Int'l, L.L.C.*,
831 F.3d 296 (5th Cir. 2016) .......... 12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 9

*Bigham v. Envirocare of Utah, Inc.*,
123 F.Supp.2d 1046 (S.D. Tex. 2000) .......... 5, 6, 9

*Bowen v. United States*,
570 F.2d 1311 (7th Cir. 1978) .......... 5

*Carey v. 24 Hour Fitness, USA, Inc.*,
669 F.3d 202 (5th Cir. 2012) .......... 11, 12

*Cicalese v. Univ. of Tex. Med. Branch*,
924 F.3d 762 (5th Cir. 2019) .......... 3, 4, 8, 9

*Cottman Transmission Sys., Inc. v. Martino*,
36 F.3d 291 (3d Cir. 1994) .......... 5

*Galderma Labs., L.P. v. Teva Pharm. USA, Inc.*,
290 F.Supp.3d 599 (N.D. Tex. 2017) .......... 3, 4

*Ginter ex rel. Ballard v. Belcher, Prendergast & Laporte*,
536 F.3d 439 (5th Cir. 2008) .......... 11

*Gulf Ins. Co. v. Glasbrenner*,
417 F.3d 353 (2d Cir. 2005) .......... 6, 10

*Haynsworth v. The Corporation*,
121 F.3d 956 (5th Cir. 1997) .......... 11

*In re AIU Ins. Co.*,
148 S.W.3d 109 (Tex. 2004) .......... 12

*In re Laibe Corp.*,
307 S.W.3d 314 (Tex. 2010) .......... 11

*In re 24R, Inc.*,
324 S.W.3d 564 (Tex. 2010) .......... 11

*Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*,
920 F.3d 890 (5th Cir. 2019) .......... 9

*Jenkins Brick Co. v. Bremer*,
321 F.3d 1366 (11th Cir. 2003) .......... 5, 6

*Morrison v. Amway Corp.*,
517 F.3d 248 (5th Cir. 2008) .......... 11

*PCL Civil Constructors, Inc. v. Arch Ins. Co.*,
979 F.3d 1070 (5th Cir. 2020) .......... 11

*Richards v. United States*,
369 U.S. 1 (1962) .......... 5, 6

*Rieder v. Woods*,
603 S.W.3d 86 (Tex. 2020) .......... 11

*Scherk v. Alberto-Culver Co.*,
417 U.S. 506 (1974) .......... 12

**STATUTES AND RULES**

FED. R. CIV. P. 4(d)(3) .......... 1

28 U.S.C. §1346(b)(1) .......... 5

28 U.S.C. §1391(b)(2) .......... passim

28 U.S.C. §1406(a) .......... 4

**OTHER AUTHORITIES**

Amazon.com, *AWS Site Terms*, https://amzn.to/3qXSPt2 .......... 10

Amazon.com, *What Is Cloud Computing?*, https://amzn.to/2KZD7hO .......... 7, 8

Cloudflare.com, *What Is the Cloud?*, https://bit.ly/2MClB3K .......... 8

Donna Goodison, *AWS Competencies Launch in Travel, Energy, Mainframe Migration*, CRN.COM (Dec. 4, 2020), https://bit.ly/3r13OC1 .......... 9

Nick Galov, *Cloud Adoption Statistics for 2021*, HOSTINGTRIBUNAL.COM (Jan. 19, 2021), https://bit.ly/3cl8UVE .......... 8

## INTRODUCTION

Pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure, defendant Kiwi.com, Inc. moves to dismiss the complaint, or alternatively to transfer this case, in favor of a proper venue under 28 U.S.C. §1391(b)(2).[1] Neither of the bases for venue asserted by plaintiff Southwest Airlines Co. justify hearing this suit in the Northern District of Texas. Because the events giving rise to Southwest's claims occurred entirely outside this district, the Court should dismiss, or alternatively transfer to an appropriate forum.

Kiwi.com specializes in providing completely new and unique travel itineraries that cannot be found anywhere else on the market—namely, multi-modal combinations of non-cooperating air, bus, and train carriers. Consumers benefit from using Kiwi.com, which provides real-time price discovery, price aggregation, and other features that enhance consumers' ability to organize and plan unique travel experiences online. Together with this unique content, Kiwi.com offers complementary travel guarantees. Thus, Kiwi.com is not a mere reseller of carriers' content, but a builder of completely new travel itineraries, options, and products—a pioneering business model Kiwi.com refers to as the "Virtual Global Supercarrier," rather than just the online travel agent (OTA) resale model adopted by Expedia, Kayak, and similar travel sites.

---

[1] For purposes of clarity, Kiwi.com, Inc. presently moves on its own behalf only. Nothing stated or omitted herein constitutes, nor should be construed as, a waiver of any rights or arguments held by Kiwi.com s.r.o., which will respond to the complaint in due course. *See* FED. R. CIV. P. 4(d)(3).

This case arises from Kiwi.com's collection and republication of publicly available flight and fare data posted on Southwest's website. The principal acts by Kiwi.com that allegedly give rise to liability are its gleaning of that information from HTTP responses received and interpreted on Kiwi.com's computers and its inclusion of such data on Kiwi.com's own website. None of those acts occurred in the Northern District, not even allegedly. Rather, with respect to events giving rise to Southwest's claims, the only act by Kiwi.com that Southwest contends occurred here was Kiwi.com "accessing" Southwest's website, southwest.com.

Southwest's conclusory and bare assertion—that in accessing the website Kiwi.com accessed servers located in the district—fails to meet the *Twombly*/*Iqbal* plausibility standard required to satisfy its burden to plead proper venue. Any Internet engineer, and even the vast majority of casual web users, know that in this day and age corporate websites like southwest.com are typically "in the cloud," not on premises at the corporate HQ. Publicly available information regarding Southwest's enterprise IT partnership with Amazon Web Services, the leading cloud-hosting provider, reinforces the unlikelihood of the complaint's barebones venue allegation. Against that backdrop, Southwest's allegation makes it no more than speculatively conceivable that any of Kiwi.com's alleged acts occurred here. To the contrary, it is overwhelmingly likely that no act by Kiwi.com took place in the Northern District, and absent such a link, venue cannot be sustained here under the venue provision Southwest invokes.

Southwest cannot salvage that inadequate pleading by reliance on the forum-selection provision contained in its site's "Terms and Conditions"—a unilateral "browsewrap" contract of adhesion that theoretically comes into force upon merely viewing Southwest's home page. Even assuming, for purposes of argument, that a valid and enforceable contract existed between Kiwi.com and Southwest on the basis of these Terms, Southwest's retention of the ability to change the forum-selection provision at will, retroactively, and without notice renders any agreement as to that clause illusory and its enforcement unreasonable.

The Court should dismiss this case for improper venue or transfer it to the Western District of Washington—the forum embracing Southwest's apparent website hosting provider, Amazon Web Services. Alternatively, to the extent the Court wishes to see further evidence regarding where Kiwi.com accessed Southwest's website in order to determine the proper forum, it should permit Kiwi.com to undertake limited discovery on venue questions and hold an evidentiary hearing on the matter.

**STANDARDS GOVERNING THIS MOTION**

In this district, "the plaintiff bears the burden of sustaining venue in the district in which the suit was brought." *Galderma Labs., L.P. v. Teva Pharm. USA, Inc.*, 290 F.Supp.3d 599, 605 (N.D. Tex. 2017). "To survive a motion to dismiss, a complaint must contain sufficient factual matter which, when taken as true, states a claim to relief that is plausible on its face"—that is, one that pleads enough factual content to "allow[] the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 765-66 (5th Cir. 2019).

"In ruling on [a] Rule 12(b)(3) motion, the Court initially accepts as true all of the well-pleaded allegations in the [complaint] and resolves any factual conflicts in Plaintiffs' favor." *Galderma Labs.*, 290 F.Supp.3d at 605. "However, the Court may consider evidence in the record beyond the facts alleged," and if the defense "controvert[s] specific facts alleged in the complaint, the Court is no longer required to accept those controverted facts as true; rather, the Court may make factual findings in the context of a Rule 12(b)(3) venue challenge based upon an evidentiary hearing." *Id.* at 605-06. "If venue is improper, the Court has broad discretion to dismiss the case or, in the interest of justice, transfer the case to any district where venue is proper." *Id.* at 606; *see* 28 U.S.C. §1406(a).

## ARGUMENT

### I. THE STATUTORILY PROPER VENUE FOR THIS ACTION IS NOT THE NORTHERN DISTRICT OF TEXAS.

Southwest bases its assertion of proper venue on §1391(b)(2), which requires that "a substantial part of the events or omissions giving rise to the claim occurred" in this district. 28 U.S.C. §1391(b)(2). It is incorrect. The acts that form the foundation of all of Southwest's claims—Kiwi.com's allegedly unlawful collection and publication of Southwest's flight and fare data—occurred entirely outside of Texas. The sole connection Southwest alleges between the Northern District and the events giving rise to its claims is implausible and conclusory, and even if it were credited, that

connection does not rise to the level of substantiality in the context of Southwest's claims.

The language selected by Congress in crafting §1391(b)(2) determines both the nature and the scope of the inquiry it demands. "The test for determining venue is not the defendant's 'contacts' with a particular district, but rather the location of those 'events or omissions giving rise to the claim.'" *Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 294 (3d Cir. 1994). "Only the events that directly give rise to a claim are relevant." *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir. 2003). And "[a]ctions taken by a plaintiff do not support venue." *Bigham v. Envirocare of Utah, Inc.*, 123 F.Supp.2d 1046, 1048 (S.D. Tex. 2000). Thus, "[i]n determining whether or not venue is proper, the Court looks to the defendant's conduct, and where that conduct took place." *Id.*

The crucial question of "where" conduct occurred, for purposes of §1391, parallels the choice-of-law inquiry under the Federal Tort Claims Act, which turns on "the place where the act or omission occurred." *See* 28 U.S.C. §1346(b)(1). That phrase, courts have held, "necessarily refers to the situs of [the] conduct that is asserted to be actionable." *Bowen v. United States*, 570 F.2d 1311, 1318 (7th Cir. 1978). So too under the indistinguishable language employed in §1391(b)(2). *E.g.*, *Bigham*, 123 F.Supp.2d at 1048. And in an FTCA case involving an air control tower's negligence in one state leading to a plane crash in another, the Supreme Court made clear that "where the act or omission occurred" in a multi-state action does not encompass "the place where the negligence had its operative effect," only "the place

where the acts of negligence took place." *Richards v. United States*, 369 U.S. 1, 5, 10 (1962). Again, so too under §1391: "the fact that a plaintiff residing in a given judicial district feels the effects of a defendant's conduct in that district does not mean that the events or omissions occurred in that district." *Bigham*, 123 F.Supp.2d at 1048.

In addition, "of the places where the events have taken place, only those locations hosting a 'substantial part' of the events are to be considered." *Jenkins Brick*, 321 F.3d at 1371. District courts must "take seriously the adjective 'substantial.'" *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 357 (2d Cir. 2005). Doing so "means for venue to be proper, *significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question." *Id.* "It would be error, for instance, to treat the venue statute's 'substantial part' test as mirroring the minimum contacts test employed in personal jurisdiction inquiries." *Id.*

Here, the sole allegation Southwest offers to meet §1391's requirements is that Kiwi.com "accessed . . . Southwest servers located in this judicial district." Dkt. No. 1 ("Compl.") ¶20.[2] But Kiwi.com did not come to the Northern District to access those servers; rather, the necessary implication of Southwest's barebones allegation of "access[ing]" is that HTTP requests made by Kiwi.com to the URL http://southwest.com were received and responded to from software running on computers located in the Northern District. Given the realities of modern Internet

[2] Southwest cannot establish proper venue under §1391(b)(2) through reliance on assertions that the alleged effects of Kiwi.com's acts, or the damages Southwest allegedly suffered, were felt in the Northern District of Texas. *See* Compl. ¶¶19, 20. Neither damages nor downstream effects of alleged wrongs comprise "the events or omissions giving rise to the claim" as a matter of law. *Bigham*, 123 F.Supp.2d at 1048; *see also Richards*, 369 U.S. at 9-10.

architecture, that threadbare and conclusory allegation fails to satisfy the *Twombly*/*Iqbal* plausibility threshold for pleading.

Some background on the physical and logical architecture of the Internet may help illustrate. In the early days of the Internet, many companies built customer-facing websites that lived on their own premises. The HTML or other code comprising the website was stored in files on a dedicated computer, generally one with lots of memory and a high-bandwidth Internet connection, that ran a "web server"—a continuously-running program to accept inbound HTTP requests, process them, and send outbound HTTP responses. That computer (also referred to as a server) was often located in a closet or, later, a server room in the business's office.

As web server technologies improved and the demands on sites increased, the architecture of server installations grew more complex. Corporate IT departments began outsourcing management and ownership of the physical infrastructure supporting websites and other mission-critical functions. Initially through "co-locating" their own servers in off-site data centers, and later through "hosting" arrangements under which processing power and storage space were essentially rented on third-party computers, the adoption of remote processing externalized both ownership and location of the servers on which the corporate website resided.

The more recent development and widespread enterprise adoption of "cloud computing" has accelerated and magnified these trends. "Cloud computing is the on-demand delivery of IT resources over the Internet with pay-as-you-go pricing. Instead of buying, owning, and maintaining physical data centers and servers, you can access

technology services, such as computing power, storage, and databases, on an as-needed basis from a cloud provider like Amazon Web Services (AWS).” Amazon.com, *What Is Cloud Computing?*, https://amzn.to/2KZD7hO. “Cloud servers are located in data centers all over the world. By using cloud computing, users and companies don’t have to manage physical servers themselves or run software applications on their own machines.” Cloudflare.com, *What Is the Cloud?*, https://bit.ly/2MClB3K. Industry statistics demonstrate the widespread adoption of these techniques among Southwest’s peer corporations. *See, e.g.*, Nick Galov, *Cloud Adoption Statistics for 2021*, HOSTINGTRIBUNAL.COM (Jan. 19, 2021), https://bit.ly/3cl8UVE (compiling statistics reflecting that 94% of large businesses use cloud services, with only 27% of workload across the entire enterprise being supported “on-premise” as of 2020).

In light of these advancements, two conditions typify the physical infrastructure underlying many websites, including virtually all high-performing commercial ones. First, they are ***physically distributed***, nationally or even globally. Second, they are ***externally hosted***, not located on their owners’ premises. It can no longer be assumed, as the complaint does, that just because a business enterprise with a website is located in one place, the website itself is located there as well. Accordingly, when, as here, venue turns on the technical question of where, geographically, HTTP requests are sent and answered, it is insufficient to meet the plausibility required by *Twombly* and *Iqbal* merely to conclusorily assert that, by connecting to Southwest’s website, Kiwi.com accessed servers “located in this district.” *See Cicalese*, 924 F.3d at 765-66 (“A complaint ‘does not need detailed factual

allegations,' but the facts alleged 'must be enough to raise the right to relief above the speculative level.'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007))).

Moreover, publicly available information regarding Southwest's IT operations raises significant doubt that the servers hosting its website are, as alleged, physically located in the Northern District of Texas. In particular, Southwest has trumpeted its partnership with the leading cloud computing provider, Amazon Web Services, in architecting its enterprise IT services. *E.g.*, Donna Goodison, *AWS Competencies Launch in Travel, Energy, Mainframe Migration*, CRN.COM (Dec. 4, 2020), https://bit.ly/3r13OC1 (quoting Southwest's managing director for technology platforms on Southwest's use of AWS). In light of these facts, Southwest's bare assertion that Kiwi.com's "accessing" occurred in the Northern District fails to "raise the right to relief above the speculative level." *See, e.g.*, *Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 899 (5th Cir. 2019) ("[A] complaint's allegations must make relief plausible, not merely conceivable," so pleading factual matter that is insufficient "to permit the court to infer more than the mere possibility" of ultimate proof justifies dismissal.)

As receipt of Kiwi.com's HTTP requests to southwest.com constitutes the only "events or omissions giving rise to the claim" that Southwest has plausibly alleged occurred within *any* American jurisdiction, the physical location at which those events occurred properly determines venue in this action. *See Bigham*, 123 F.Supp.2d at 1048 ("[T]he Court looks to the defendant's conduct, and where that conduct took place."). Moreover, even if Kiwi.com "accessing" Southwest's website by

communicating with servers not located within the district were somehow treated as occurring here, that minimal tie is not substantial enough within the context of Southwest's claims to justify its assertion of statutorily proper venue. *See Gulf Ins. Co.*, 417 F.3d at 357 (noting that §1391(b)(2)'s substantiality criterion limits venue-creating events to "*significant* events or omissions *material* to the plaintiff's claim"). Thus, under the terms of §1391(b)(2), the proper venue for this dispute is not the location of Southwest's headquarters, but rather the site of Southwest's website hosting provider. Southwest's use of Amazon Web Services for enterprise hosting indicates that, to the extent they occurred within the United States at all, "the events or omissions giving rise to the claim"—namely, Kiwi.com's accessing of the southwest.com website—occurred where Amazon Web Services is located: the Western District of Washington. *See* Amazon.com, *AWS Site Terms*, https://amzn.to/3qXSPt2.

## II. THE FORUM-SELECTION PROVISION OF SOUTHWEST'S WEBSITE TERMS & CONDITIONS DOES NOT MANDATE VENUE IN THE NORTHERN DISTRICT.

Assuming *arguendo* that the Terms and Conditions stated on Southwest's website constitute a binding contract between Southwest and Kiwi.com,[3] the forum-selection clause of that agreement is invalid and unenforceable.

Texas law governs the question of the clause's validity, while federal law governs the question of its enforceability if valid. Under Texas law, a forum-selection

[3] Kiwi.com does not concede that such a binding contract exists or that it is generally enforceable if so. However, the argument made here assumes those points, making it unnecessary to address the issue at this stage. Kiwi.com reserves the question of whether Southwest's terms and conditions bind Kiwi.com for subsequent argument and consideration in connection with the merits of the case.

clause is valid unless "(1) enforcement would be unreasonable or unjust, (2) the clause is invalid for reasons of fraud or overreaching, (3) enforcement would contravene a strong public policy of the forum where the suit was brought, or (4) the selected forum would be seriously inconvenient for trial." *Rieder v. Woods*, 603 S.W.3d 86, 93 (Tex. 2020) (quoting *In re Laibe Corp.*, 307 S.W.3d 314, 316 (Tex. 2010)). Federal law, meanwhile, mandates enforcement of a valid forum-selection clause "unless the party opposing its enforcement can show that the clause is unreasonable," as is true if, inter alia, the clause "was the product of fraud or overreaching." *PCL Civil Constructors, Inc. v. Arch Ins. Co.*, 979 F.3d 1070, 1074 (5th Cir. 2020) (quoting *Ginter ex rel. Ballard v. Belcher, Prendergast & Laporte*, 536 F.3d 439, 441 (5th Cir. 2008), and *Haynsworth v. The Corporation*, 121 F.3d 956, 963 (5th Cir. 1997)). Under either body of law, however, the clause at issue here fails.

It is settled law that an arbitration clause in a Texas contract will not be enforced by federal courts if the contract grants a unilateral right to amend its terms that renders the clause "capable of being retroactively modified." *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 205 (5th Cir. 2012). Such a clause is illusory because the amending party "can 'avoid its promise to arbitrate by amending the provision or terminating it altogether.'" *Id.* (quoting *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010)). Where a contracting party is "able to amend its policy and thus renege on its promise to arbitrate even in the context of disputes already underway, . . . its agreement to arbitrate [is] illusory." *Id.* at 206 (citing *Morrison v. Amway Corp.*, 517 F.3d 248, 257 (5th Cir. 2008)).

It is equally well-recognized that arbitration clauses are but one "type of forum-selection clause." *In re AIU Ins. Co.*, 148 S.W.3d 109, 115 (Tex. 2004); *accord, e.g.*, *Barnett v. Dyncorp Int'l, L.L.C.*, 831 F.3d 296, 302 (5th Cir. 2016) (describing arbitration clauses as "in effect, a specialized kind of forum-selection clause" (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974))). The same rule thus applies—if the contract's terms permit the forum-selection clause to be amended retroactively, then the purported agreement as to the forum for resolving disputes is illusory.

Southwest's Terms and Conditions plainly fail *Carey*'s test. The unilateral power Southwest reserves to alter the contractual terms that accessing its site imposes is literally unbounded: "The Terms may be revised and updated by us from time to time without notice to you. All changes are effective immediately when we post them. Your continued use of the Sites is your acceptance of the revised and updated Terms." Compl. Ex. A at 1. For purposes of determining the forum-selection clause's illusory character, that power thus necessarily extends to retroactive alterations. *See Carey*, 669 F.3d at 206-07 ("[S]ilence about the possible retroactive application of amendments to the arbitration policy [is] interpreted to allow amendments to apply retroactively."). And while Southwest's terms require neither notice nor acceptance for an amendment to be effective, it would not change the analysis even if they were required. *See id.* at 207-08 ("[N]otice and acceptance are not sufficient to render an arbitration provision non-illusory" "when retroactive amendment is possible.").

Because Southwest arrogates to itself the unrestrained authority to retroactively negate the promise it made in the forum-selection clause, that clause is illusory and so invalid as a matter of Texas law. For the same reason, its inclusion in the Terms and Conditions' contract of adhesion represents precisely the type of overreach that renders it unenforceable as a matter of federal law even if it were formally valid. Either way, the clause presents no bar to the Court exercising its discretion to either dismiss this case for improper venue or transfer it to the venue properly indicated by 28 U.SC. §1391.

## CONCLUSION

For the foregoing reasons, Kiwi.com respectfully requests that the Court dismiss this case for improper venue or, alternatively, transfer the action to the Western District of Washington. Alternatively, Kiwi.com requests that the Court permit limited discovery on issues relevant to the venue question in order to determine a district that provides proper venue under 28 U.S.C. §1391(b)(2).

Respectfully submitted,

/s/ Asa C. Garber
Asa C. Garber (*admitted pro hac vice*)
Colorado Bar No. 48256
MCCARTHY GARBER LAW, LLC
501 S. Cherry Street #1100
Denver, Colorado 80246
(720) 504-5294
asa@mccarthygarberlaw.com

Ryan P. Bates
Texas Bar No. 24055152
BATES PLLC
919 Congress Avenue, Suite 1305
Austin, Texas 78701
(512) 694-5268
rbates@batespllc.com

*Attorneys for Defendant*
*Kiwi.com, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that, on the 5th day of February, 2021, I served a copy of the foregoing Brief in Support of Motion to Dismiss on the attorneys of record for all parties via the Court's electronic filing system, as follows.

Michael C. Wilson
S. Wallace Dunwoody
Amanda K. Greenspon
Julie M. Christensen
MUNCK WILSON MANDALA, LLP
12770 Coit Road, Suite 600
Dallas, Texas 75251
mwilson@munckwilson.com
wdunwoody@munckwilson.com
agreenspon@munckwilson.com
jchristensen@munckwilson.com

*Counsel for Plaintiff Southwest Airlines Co.*

/s/ Ryan P. Bates
Ryan P. Bates