IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SOUTHWEST AIRLINES CO., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 3:21-cv-00098 |
| | § | |
| KIWI.COM, INC. and KIWI.COM S.R.O., | § | |
| | § | |
| Defendants. | § | |

---

## PLAINTIFF SOUTHWEST AIRLINES CO.'S MOTION FOR PRELIMINARY INJUNCTION AND BRIEF IN SUPPORT

---

Michael C. Wilson
Texas State Bar No. 21704590
mwilson@munckwilson.com
S. Wallace Dunwoody
Texas Bar. No. 24040838
wdunwoody@munckwilson.com
Amanda K. Greenspon
Florida Bar No. 1014584
agreenspon@munckwilson.com
Julie M. Christensen
Texas State Bar No. 24105601
jchristensen@munckwilson.com
MUNCK WILSON MANDALA, LLP
12770 Coit Road, Suite 600
Dallas, Texas 75251
Telephone: (972) 628-3600

**ATTORNEYS FOR PLAINTIFF SOUTHWEST AIRLINES CO.**

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ...................................................................................... 1

II.    STATEMENT OF FACTS ......................................................................... 2

     A.    Southwest operates a commercial airline business known for its low-cost fares and customer-friendly policies. ............................................... 2

     B.    Southwest retains the exclusive online distribution rights for flights offered on the Southwest Website. ..................................................... 3

     C.    Southwest's Website Terms expressly prohibit all unauthorized scraping of data, republication of flight schedules and fares, and sales of Southwest flights. ........................................................................................ 5

     D.    Kiwi is violating Southwest's Website Terms by scraping data, republishing schedules and fares, and selling Southwest flights and services without permission. ............................................................. 7

          1.    Kiwi's unauthorized activities prevent Southwest from providing customers with time-sensitive flight information. ...................... 9

          2.    Kiwi's unauthorized activities interfere with customer refunds for cancellations. ............................................................................. 10

          3.    Kiwi's unauthorized activities are unfair and harmful to Southwest and its customers. .................................................................. 11

     E.    Before filing this lawsuit, Southwest sent Kiwi multiple cease-and-desist notices. ........................................................................................ 14

     F.    Money damages are inadequate to compensate for the ongoing injuries to Southwest's business and customers. ............................................. 15

III.   ARGUMENTS AND AUTHORITIES........................................................ 15

     A.    Southwest is likely to succeed on its breach of contract claim............. 16

          1.    The Website Terms are a valid contract between the parties................... 16

          2.    Southwest performed its obligations under the Website Terms. ............. 18

          3.    Kiwi breached the Website Terms........................................................ 18

          4.    Kiwi's breaches have caused Southwest to suffer damages. .................. 18

     B.    Southwest and its customers will continue to suffer irreparable injuries if the injunction is denied. .................................................................. 20

          1.    Southwest's reputational damage and loss of customer goodwill is irreparable. ............................................................................... 21

          2.    Kiwi's sale of Southwest flights diverts traffic from the Southwest Website and causes Southwest to suffer lost ancillary sales and business opportunities. ............................................................. 21

i

C.     The ongoing harm to Southwest and its customers outweighs any possible damage that the injunction might cause to Kiwi. .................................................. 22

D.     An injunction prohibiting Kiwi's unauthorized sales of Southwest flights will serve the public interest. .............................................................. 23

IV.     CONCLUSION ................................................................................................ 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
  664 F.3d 922 (Fed. Cir. 2012)..........................................................................20, 21

*Cairo, Inc. v. Crossmedia Servs., Inc.*,
  2005 WL 756610 (N.D. Cal. April 1, 2005)...........................................................16

*Enter. Int'l v. Corporacion Estatal Petrolera Ecuatoriana*,
  762 F.2d 464 (5th Cir. 1985)..................................................................................22

*Foxtrap, Inc. v. Foxtrap, Inc.*,
  671 F.2d 636 (D.C. Cir. 1982)................................................................................22

*Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*,
  480 S.W.2d 607 (Tex. 1972)...................................................................................16

*Hollywood Fantasy Corp. v. Gabor*,
  151 F.3d 203 (5th Cir. 1998) .................................................................................16

*Hoover v. Morales*,
  164 F.3d 221 (5th Cir. 1998) .................................................................................15

*Jiffy Lube Int'l, Inc. v. Weiss Bros. Inc.*,
  834 F. Supp. 683 (D.N.J. 1993) .............................................................................23

*Lakedreams v. Taylor*,
  932 F.2d 1103 (5th Cir. 1991) ...............................................................................15

*Le-Vel Brands, LLC v. Bland*,
  No. 3:19-CV-00154-L, 2019 WL 4753041 (N.D. Tex. Sept. 30, 2019)................20

*Millennium Rests. Grp., Inc. v. City of Dallas*,
  181 F.Supp.2d 659 (N.D. Tex. 2001) .....................................................................21

*Miss. Power & Light Co. v. United Gas Pipe Line Co.*,
  760 F.2d 618 (5th Cir. 1985) .......................................................................20, 21, 24

*Nevarez v. Forty Niners Football Co., LLC*,
  16-CV-07013, 2017 WL 3492110 (N.D. Cal. Aug. 15, 2017) ...............................17

*Pfeiffer v. Ajamie PLLC*,
  469 F. Supp. 3d 752 (S.D. Tex. 2019) ...................................................................20

*R.R. Mgmt. Co., L.L.C. v. CFS La. Midstream Co.*,
    428 F.3d 214 (5th Cir. 2005) ................................................................16

*Redi-Mix Sols., Ltd. v. Express Chipping, Inc.*,
    No. 6:16-CV-298-RWS-KNM, 2016 WL 7634050 (E.D. Tex. Dec. 2, 2016)......................20

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2nd Cir. 2004).................................................................16

*Sparrow Barns & Events, LLC v. Ruth Farm Inc.*,
    No. 4:19-CV-00067, 2019 WL 1560442 (E.D. Tex. Apr. 10, 2019).....................20

*Sw. Airlines Co. v. BoardFirst, L.L.C.*,
    3:06-CV-0891-B, 2007 WL 4823761 (N.D. Tex. Sept. 12, 2007) ................................. *passim*

*Sw. Airlines Co. v. Farechase, Inc.*,
    318 F. Supp. 2d 435 (N.D. Tex. 2004) ......................................................6

*Sw. Airlines Co. v. Roundpipe LLC, et al.*,
    375 F. Supp. 3d 687 (N.D. Tex. 2019) .....................................................6

*Ticketmaster L.L.C. v. RMG Techs., Inc.*,
    507 F. Supp. 2d 1096 (C.D. Cal. 2007) ...................................................17

*Urgent Gear, Inc. v. Savoia*,
    3:01-CV-2190-D, 2001 WL 1577395 (N.D. Tex. Dec. 10, 2001)..........................23

*Valvtechnologies, Inc. v. North*,
    No. CIV.A. H-10-3943, 2011 WL 649651 (S.D. Tex. Feb. 10, 2011) ...................20

**Other Authorities**

14 C.F.R. § 256.6 ......................................................................................3, 23

14 C.F.R. § 259.8(a).....................................................................................9

## I.      INTRODUCTION

Almost 50 years since its first flights in 1971, Southwest Airlines Co. ("Southwest") has grown to become one of the most-flown airlines in the United States. One pillar of Southwest's success is its excellent customer service and unique customer-friendly policies. Southwest's focus on top-rated customer service is emphasized with its trademark "Heart" logo. To maintain control over ticket sales through its website at www.Southwest.com (the "Southwest Website"), Southwest does not allow online travel agencies ("OTAs") like Expedia, Priceline, or Kayak to sell its flights. For that reason, Southwest specifically prohibits commercial use or scraping of "Company Information," including flight schedules and fares, as part of the Terms and Conditions for use of the Southwest Website (the "Website Terms").

Defendants Kiwi.com, Inc. and Kiwi.com s.r.o. (collectively, "Kiwi") operate an OTA that unlawfully harvests Southwest's data and resells Southwest flights to customers at inflated prices. Kiwi has actual knowledge that its booking practices violate the Website Terms. With each purchase, Kiwi accepts the Website Terms. Southwest also sent Kiwi multiple cease-and-desist notices detailing Kiwi's unauthorized conduct and the Website Terms. Still, despite repeated demands, Kiwi refuses to stop. Even in the short time since Southwest filed this lawsuit, Kiwi has illegally used the Southwest Website to book thousands of Southwest flights.

Kiwi's conduct does more than breach its contractual obligations—it causes significant and irreparable harm to Southwest and its customers. As demonstrated by Southwest's lawsuit and witness declarations, Kiwi's activities cause the following harm to Southwest and its customers:

- After scraping the Southwest Website, Kiwi sells Southwest flights at inflated prices by charging extra, hidden fees and taxes not collected by Southwest;

- Kiwi misrepresents Southwest's policies on refunds, travel credits, change fees, and customer service options and charges customers additional fees for services that Southwest offers for free;

- When Kiwi completes a booking on the Southwest Website, it omits customer contact information, which interferes with important customer communications from Southwest about the upcoming trip like cancellations, delays, or safety protcols;

- Kiwi advertises "hidden city" tickets that have resulted in—and continue to cause— challenges throughout Southwest's operations;

- When Kiwi books a Southwest flight, Southwest loses the opportunity to sell the customer ancillary services, such as EarlyBird Check-In or a rental car; and

- Because Kiwi does not provide Southwest the customer's purchase information, Southwest must issue refunds to Kiwi—instead of directly to the customer—and customers often complain to Southwest about not receiving their refunds.

Not surprisingly, Kiwi has received an "F" rating from the Better Business Bureau for its tactics. These problems are examples of the reasons why Southwest prohibits unauthorized access to the Southwest Website (through the Website Terms) and carefully limits third-party sales of its tickets. Given these facts, and consistent with established precedent, the Court should promptly enjoin Kiwi's ongoing violations of the Website Terms and unauthorized sales of Southwest flights. *See Sw. Airlines Co. v. BoardFirst, L.L.C.*, 3:06-CV-0891-B, 2007 WL 4823761, at *4 (N.D. Tex. Sept. 12, 2007) (granting a permanent injunction prohibiting commercial use of Southwest's website).

## II.    STATEMENT OF FACTS

### A.    Southwest operates a commercial airline business known for its low-cost fares and customer-friendly policies.

Southwest is an airline headquartered in Dallas, Texas.[1] Following its first flights in 1971, Southwest has grown to become a leading domestic carrier with flights to over 100 destinations in

---

[1] *See* Ex. A, Hursh Decl. ¶ 3 (App. 2).

the United States and seven additional countries.[2] In peak travel season during 2019, Southwest

operated more 4,000 departures and served over 100 million passengers in that year.[3]

Southwest has built a reputation for high customer satisfaction and received the 2020 J.D.

Power award for best airline in North America,[4] along with many other recognitions and awards

for excellence.[5] While most U.S. airlines charge passengers additional fees for checked luggage,

Southwest maintains unique customer-friendly policies, including a "Bags Fly Free" policy (each

customer can check two bags for free, subject to weight and size limits) and a "No Change Fees"

policy (Southwest does not charge fees to change or cancel flights, though fare differences may

apply).[6] Southwest frequently refers to these policies in its advertising.[7]

**B.     Southwest retains the exclusive online distribution rights for flights offered on the
        Southwest Website.**

Southwest offers and sells flights to the general public through the Southwest Website and

Southwest Apps (collectively, "Southwest Digital Platforms").[8] Southwest maintains the exclusive

online distribution rights to sell Southwest flights through the Southwest Digital Platforms.

Consistent with federal law,[9] Southwest does not allow unauthorized persons or OTAs to harvest

---

[2] *See* Ex. A, Hursh Decl. ¶ 3 (App. 2).

[3] *See* Ex. A, Hursh Decl. ¶ 3 (App. 2).

[4] *See* Ex. A, Hursh Decl. ¶ 4 (App. 3); *see also* Ex. A-1, J.D. Power Award (App. 31-32).

[5] *See, e.g.,* Ex.A-2, Southwest Website available at https://www.swmedia.com/pages/awards-and-recognition (listing other awards) (App. 36-38); Ex. E-7, Wall Street Journal, "The Best and Worst U.S. Airlines of 2020," available at https://www.wsj.com/articles/the-best-and-worst-u-s-airlines-of-2020-11611756016 (recognizing Southwest as number 1 for Overall Rank in 2020) (App. 560).

[6] *See* Ex. A, Hursh Decl. ¶ 4 (App. 3).

[7] *See* Ex. A, Hursh Decl. ¶ 4 (App. 3).

[8] *See* Ex. A, Hursh Decl. ¶ 5 (App. 3).

[9] *See* 14 C.F.R. § 256.6 ("Nothing in this section requires an air carrier, foreign air carrier, or ticket agent to allow a system to access its internal computer reservation system or to permit 'screen scraping' or 'content scraping' of its Web site; nor does it require an air carrier or foreign air carrier to permit the marketing or sale of the carrier's services through any ticket agent or other carrier's system. 'Screen scraping' as used in this paragraph refers to a process whereby a company uses computer software techniques to extract information from other companies' Web sites without permission from the company operating the targeted Web site.").

or "scrape" data from the Southwest Website or to sell Southwest flights.[10] That is one reason why Southwest flights are not sold through websites like Kayak, Expedia, Google Flights, or Priceline.[11] Although other airlines embrace the use of OTAs, Southwest's approach allows it to deal directly with customers, control the customer experience, ensure customer satisfaction, protect customers from misinformation, control costs, and promote other travel services like Early Bird Check-In and car rentals.[12]

The Southwest Digital Platforms offer customers low-fare flights and provide ticket information, reservation details, and additional booking options for Southwest flights.[13] Customers may obtain Southwest customer support with (i) a toll-free phone call; (ii) a direct message through social media, such as Twitter and Facebook; or (iii) by email on the Southwest Website.[14] The Southwest App also offers a free live chat capability for customers to connect with Southwest's Customer Support & Services team.[15] The Southwest Digital Platforms also provide answers to over 45 frequently asked questions, a site search tool to find travel related answers, and a free Digital Customer Feedback tool.[16] The Southwest Digital Platforms enable customers to quickly make changes and cancellations to itineraries for free (subject to any fare differences) up to 10 minutes before the scheduled departure time.[17]

---

[10] *See* Ex. A, Hursh Decl. ¶ 6 (App. 3).

[11] *See* Ex. A, Hursh Decl. ¶ 6 (App. 3).

[12] *See* Ex. A, Hursh Decl. ¶ 6 (App. 3).

[13] *See* Ex. A, Hursh Decl. ¶ 7 (App. 3-4).

[14] *See* Ex. A, Hursh Decl. ¶ 8 (App. 4).

[15] *See* Ex. A, Hursh Decl. ¶ 9 (App. 4).

[16] *See* Ex. A, Hursh Decl. ¶¶ 10-11 (App. 5).

[17] *See* Ex. A, Hursh Decl. ¶ 12 (App. 5).

Southwest offers ancillary services on the Southwest Digital Platforms, including options to (i) purchase EarlyBird Check-In; (ii) create a Rapid Reward loyalty account and earn points redeemable for future Southwest flights; (iii) add a rental car to a reservation; or (iv) book a hotel or travel package through Southwest Vacations.[18]

**C.     Southwest's Website Terms expressly prohibit all unauthorized scraping of data, republication of flight schedules and fares, and sales of Southwest flights.**

The Southwest Digital Platforms provide links to Southwest's Website Terms, which govern use of the Southwest Digital Platforms.[19] As stated on the Southwest Website's homepage and in the Website Terms, use of the Southwest Website constitutes acceptance of the Website Terms.[20] Moreover, for all online purchases, the user must affirmatively acknowledge and accept the Southwest Terms by clicking a button that states: "By clicking 'Purchase,' I agree to the Terms and Conditions below, the privacy policy, and the contract of carriage," which appears just above a yellow "Purchase" button with hyperlinks to the Website Terms, Privacy Policy, and Contract of Carriage.[21]

Per the Website Terms, all information concerning Southwest's products and services, "including flight schedules, routes, [and] fares," called "Company Information," is owned by Southwest.[22] Southwest grants each user "a limited, non-exclusive, revocable, non-assignable, personal, and non-transferable license to download, display, view, use, play the Company

---

[18] *See* Ex. A, Hursh Decl. ¶ 7 (App. 3-4).

[19] *See* Ex. A, Hursh Decl. ¶ 19 (App. 7).

[20] *See* Ex. A, Hursh Decl. ¶ 20 (App. 8).

[21] *See* Ex. A, Hursh Decl. ¶ 21 (App. 8).

[22] Ex. A-3, Website Terms at 1 (Ownership of Company Information) (App. 40).

Information … *for your personal, non-commercial use only*."[23] But the Website Terms expressly forbid the following types of conduct:

- *Republication of Southwest flight schedules and fares*, including to "copy, display, distribute, publish, re-post, reproduce, re-use, sell, transmit or use the Service or Company Information to create a derivative work";[24]

- *Commercial use of the Southwest Website* "for any commercial purpose,"[25] including "for or in connection with offering any third-party product or service," without express permission from Southwest;[26]

- *Scraping data from the Southwest Website*, including use of any "deep-link," "page-scrape," "robot," "spider," "algorithm," or other automatic device to "access, acquire, copy or monitor any portion of the Website";[27] and

- *Any use* that is "fraudulent, unlawful, false or misleading."[28]

As a general practice, if Southwest discovers that an unauthorized OTA is selling Southwest flights or related services, Southwest will send a cease-and-desist notice and provide the violator with a copy of the Website Terms, demanding compliance for future use of the Southwest Website.[29] When an individual or website operator refuses to comply with the Website Terms, Southwest has been forced to file a lawsuit to enforce the Website Terms.[30] *See, e.g.*, *Sw. Airlines Co. v. Farechase, Inc.*, 318 F. Supp. 2d 435 (N.D. Tex. 2004); *Sw. Airlines Co. v. BoardFirst, L.L.C.*, Case No. 3:06-CV-0891, 2007 WL 4823761 (N.D. Tex. Sept. 2007); and *Sw. Airlines Co. v. Roundpipe LLC, et al.*, 375 F. Supp. 3d 687 (N.D. Tex. 2019).

---

[23] *See* Website Terms at 1 (emphasis added) (App. 40).

[24] *See* Website Terms at 2 (App. 41).

[25] *See* Website Terms at 2 (App. 41).

[26] *See* Website Terms at 2 (App. 41).

[27] *See* Website Terms at 2 (App. 41).

[28] *See* Website Terms at 2 (App. 41).

[29] *See* Hursh Decl. ¶ 24 (App. 10).

[30] *See* Hursh Decl. ¶ 24 (App. 10).

**D.     Kiwi is violating Southwest's Website Terms by scraping data, republishing schedules and fares, and selling Southwest flights and services without permission.**

Kiwi operates an OTA business that reportedly performs 100,000,000 daily searches across numerous airline websites selling 40,000 flights per day.[31] Kiwi's website boasts €1.3 billion of turnover in 2019 (equivalent to approximately $1.5 billion USD).[32] However, Kiwi.com has an "F" rating with the Better Business Bureau relating to numerous customer complaints for failing to pay refunds.[33] Kiwi was recognized with an "award" for the "worst customer service" in 2020.[34] Tripadvisor, a popular travel website, hosts travel forums entitled "Warning: Kiwi.com is a SCAM" and "WARNING: Don't buy travels or air tickets from KIWI.COM" with hundreds of customer reviews critical of Kiwi.[35] The Facebook group "Kiwi.com – victims of the scam Kiwi" (pictured below) has 3,900 members seeking to pursue a class action against Kiwi:[36]



Southwest has also received hundreds of complaints and inquiries from customers who purchased Southwest flights from Kiwi.[37] Typical complaints from Southwest's customers include (i) not receiving refunds for cancelled reservations or flights even after Southwest refunded the

---

[31] *See* Ex. A-4, Kiwi Website available at https://www.kiwi.com/us/pages/content/about (App. 46-47).

[32] *See* Ex. A-5, Kiwi Website available at https://www.kiwi.com/us/pages/content/company (App. 53-54).

[33] *See* Ex. E-1, Better Business Bureau Kiwi Rating (App. 498-499); *see also* Ex. E-2, Better Business Bureau Customer Complaints (App. 503-528).

[34] *See* Ex. E-3, The Guardian Website available at https://www.theguardian.com/money/2020/dec/27/in-the-year-of-covid-the-awards-for-worst-customer-service-go-to (App. 397).

[35] *See* Ex. E-4, Trip Advisor Forum (App. 540-545); Ex. E-5, Trip Advisor Forum (App. 547-551).

[36] *See* Ex. E-6, Facebook Website available at https://www.facebook.com/groups/254374211743198/about (App. 553-555).

[37] *See* Ex. B, Buckley Decl. ¶¶ 8-10 (App. 91).

credit card used by Kiwi to purchase the ticket; (ii) customers not receiving notices about schedule changes or delays; (iii) customers unable to change or cancel reservations; (iv) customers confused about checked bag policies and baggage fees charged by Kiwi; and (v) customers mistakenly believing that Kiwi is Southwest's authorized agent and blaming Southwest for Kiwi's conduct.[38]

Southwest has not authorized Kiwi to scrape data from the Southwest Website, republish Southwest flight schedules and fares, or sell Southwest flights or ancillary services, all of which violate the Website Terms.[39] Kiwi's unlawful activities are substantial. For one, after receiving several cease-and-desist letters from Southwest's Legal Department, Kiwi provided a report to Southwest showing it sold more than 109,000 seats on Southwest flights in 2019 and more than 38,000 seats on Southwest flights in the first half of 2020. Southwest's records show that Kiwi booked over 20,000 flights using the Southwest Digital Platforms from August 1, 2020 to January 13, 2021,[40] and has booked more than 4,000 Southwest flights since the filing of this lawsuit on January 14, 2021.[41]

As detailed in the Website Terms, Kiwi's use of the Southwest Website constitutes acceptance of the Website Terms and forms a binding contract between Southwest and Kiwi.[42] Moreover, for each purchase, Kiwi acknowledged and accepted the Website Terms when purchasing the ticket.[43] In connection with its unauthorized sales of Southwest flights, Kiwi specifically acknowledges that: "All services provided by Southwest Airlines are subject to their

---

[38] *See* Ex. B, Buckley Decl. ¶¶ 8-10 (App. 91); *see also id.* ¶¶ 11-28 (providing specific examples) (App. 91-102).

[39] *See* Ex. A, Hursh Decl. ¶ 26 (App. 10).

[40] *See* Ex. C. Andorf Decl. ¶ 3 (App. 170-171). As detailed in the Complaint, Southwest notified Kiwi (again) during a telephone call on July 30, 2020 that it did not authorize Kiwi's sale of Southwest flights, yet Kiwi continued to its unauthorized activity after that call. Complaint ¶ 51.

[41] *See* Ex. C, Andorf Decl. ¶ 4 (App. 171).

[42] *See* Ex. A, Hursh Decl. ¶ 23 (App. 10); Website Terms at 1 (App. 40).

[43] *See* Ex. A, Hursh Decl. ¶¶ 21, 47 (App. 8, 22).

Terms and Conditions. More information is available on their website."[44] Yet, Kiwi is knowingly violating the Website Terms by, among other things, harvesting and republishing Southwest flight schedules and fares on kiwi.com without permission, commercially using Southwest's Company Information by selling Southwest flights and ancillary services, misrepresenting Southwest's policies, including charging customers fees for services that Southwest offers for free, and engaging in harmful and tortious conduct such as failing to provide refunds to customers for cancelled reservations.[45]

1.  **Kiwi's unauthorized activities prevent Southwest from providing customers with time-sensitive flight information.**

Southwest's review of Kiwi reservations made on the Southwest Digital Platforms shows that Kiwi uses email addresses with the domains "@airline.kiwi.com" and "@kachipytel.com" without including the customer's email address or phone number on the reservation.[46] That is harmful to Southwest and its customers because Southwest relies on customer contact information supplied during the booking process to notify those customers about flight changes, delays, cancellations, weather events, air traffic control delay programs, airport delays, and safety policies.[47] Some of these communications are required by federal law.[48] Southwest also routinely communicates with customers with (i) a trip confirmation notice that provides itinerary details,

---

[44] *See* Ex. A, Hursh Decl. ¶ 29 (App. 11-12).

[45] *See* Ex. A, Hursh Decl. ¶¶ 30-44, 48-50, 52-54 (App. 12-23, 28-29).

[46] *See* Ex. A, Hursh Decl. ¶ 46 (App. 22); Ex. C, Andorf Decl. ¶¶ 3-6 (App. 170-171); Ex. C-1 to C-5,  PNR Records for Kiwi Bookings Since Aug. 1, 2020 (App. 175-428).

[47] *See* Ex. A, Hursh Decl. ¶ 48 (App. 22-23); *see also id.* ¶¶ 13-18 (App. 5-7).

[48] *See* 14 C.F.R. § 259.8(a) ("Each covered carrier for its scheduled flights to, from or within the U.S. must promptly provide to passengers who are ticketed or hold reservations, and to the public, information about a change in the status of a flight within 30 minutes after the carrier becomes aware of such a change in the status of a flight. A change in the status of a flight means, at a minimum, a cancellation, diversion or delay of 30 minutes or more in the planned operation of a flight that occurs within seven calendar days of the scheduled date of the planned operation. The flight status information must at a minimum be provided in the boarding gate area for the flight at a U.S. airport, on the carrier's website, and via the carrier's telephone reservation system upon inquiry by any person.").

purchase details, helpful guidance on preparing for the trip, and links to contact Customer Support & Services and Frequently Asked Questions and Answers; and (ii) reminder notices at 30 days, 4 days, and 1 day before a scheduled trip.[49] Each communication is tailored to provide relevant information and may include additional context about changes related to the trip such as airport construction, regulatory changes, or changes to policies or procedures.[50] As an example, during the COVID-19 pandemic, pre-trip communications provide special context about mask policies, testing policies, and quarantine policies.[51] Southwest may also communicate with customers after a flight—*e.g.*, if it had an extended delay—to provide proactive customer service or issue a travel voucher or reimbursement to impacted customers.[52] These communications create a positive experience for customers.[53] But Kiwi's unauthorized sales interfere with these customer communications and, in turn, Southwest's ability to efficiently communicate with its customers about their trips.

### 2. Kiwi's unauthorized activities interfere with customer refunds for cancellations.

One common type of customer complaint Southwest receives about Kiwi relates to refunds for cancelled Southwest flights.[54] When Kiwi books flights on the Southwest Digital Platforms, Kiwi uses its own credit cards (not the customer's credit card). This means that Southwest must refund Kiwi's credit card, not the customer's credit card.[55] Many customers have complained about Kiwi failing or refusing to issue refunds to customers, even after Southwest has refunded

---

[49] *See* Ex. A, Hursh Decl. ¶¶ 13-18 (App. 5-7).

[50] *See* Ex. A, Hursh Decl. ¶¶ 16-17 (App. 6-7).

[51] *See* Ex. A, Hursh Decl. ¶ 18 (App. 7).

[52] *See* Ex. F, Reyes Decl. ¶¶ 1-9 (App. 569-571).

[53] *See* Ex. F, Reyes Decl. ¶¶ 1-9 (App. 569-571).

[54] *See* Ex. B, Buckley Decl. ¶ 9 (App. 91); *see also id.* ¶¶ 11-17 (App. 91-99).

[55] *See* Ex. A, Hursh Decl. ¶ 49 (App. 23).

the Kiwi card used to book the flight.[56] This is due at least in part to Kiwi imposing its own refund policies on unauthorized sales of Southwest flights that are different (and less customer friendly) than Southwest's refund policies.[57] Because Southwest issues the refund to the purchaser (Kiwi) but then Kiwi does not remit the payment to the customer, customers often blame Southwest and mistakenly assume that Kiwi is acting as Southwest's authorized agent, harming Southwest's strong reputation for high customer satisfaction.[58]

3.  **Kiwi's unauthorized activities are unfair and harmful to Southwest and its customers.**

Kiwi also inflates the prices for Southwest flights by adding fees and taxes not charged by Southwest.[59] For example, Kiwi charges customers hidden "service fees" in the range of $10 to $50 over and above the price of the Southwest flights and those fees go to Kiwi.[60] In an effort to sell "add on" services, Kiwi also misrepresents Southwest's fare options, cancellation policies, refund policies, and customer support services as shown in the examples below:

---

[56] *See* Ex. B, Buckley Decl. ¶¶ 9-17 (App. 91-99).

[57] *See* Ex. B, Buckley Decl. ¶¶ 9-17 (App. 91-99); *see also* Kiwi Website available at https://www.kiwi.com/en/help/covid-19-coronavirus-169/article/what-trip-refund-options-do-i-have-155/ ("When your booking is still valid and we haven't received any cancellation from the carrier(s), you can cancel up to 48 hours before your trip's scheduled departure….Your refund will depend on the fare type you picked during booking.") and at https://www.kiwi.com/us/help/search/article/200/ ("You can pick from 3 different fare types when you make a booking. You'll find the details here: Saver Ticket[,] Standard Ticket[, or] Flexi Ticket[.] Each fare has different rules when it comes to changes or cancellation. It cannot be changed after you book.").

[58] *See* Ex. B, Buckley Decl. ¶¶ 9-10 (App. 91).

[59] *See* Ex. A, Hursh Decl. ¶¶ 31-32 (App. 12-14).

[60] *See* Ex. A, Hursh Decl. ¶¶ 31-32 (App. 12-14).



Kiwi's advertisements are misleading because all Southwest flights include (i) no change fees;[61] (ii) no cancellation fees;[62] (iii) free customer support; (iv) a full travel credit for cancelled reservations; and (v) a full refund for cancelled Business Select and Anytime fares.[63] As an example of how Kiwi's offers are misleading and harmful to customers, Kiwi offers to sell customers a "checked baggage bundle" for Southwest flights for $54, even though two free checked bags are included with all Southwest tickets:



Kiwi also offers to sell customer support services and misrepresents the availability and cost of customer service for Southwest flights (which is free with no processing fees):

---

[61] Fare differences may apply to flight changes.

[62] Cancelations may be made up to 10 minutes before the scheduled departure time.

[63] *See* Ex. A, Hursh Decl. ¶¶ 7-12, 33 (App. 3-4, 16).



Kiwi also falsely advertises that it provides "automatic flight check-in" for free on Southwest flights, even though Kiwi does not provide that service to Southwest customers.[64]

In recent months, Southwest's operational employees frequently have reported customers booked through Kiwi.com traveling on "hidden city" fares, meaning that the passenger's intended final destination is not the ticketed final destination, but rather an intermediate or connecting city.[65] As an illustrative example, a passenger purchases a ticket from Los Angeles to New York with a connection in Las Vegas, but does not travel beyond Las Vegas. These are also known as "buy long/fly short" itineraries and this booking practice is a violation of Southwest's Contract of Carriage, which prohibits "[p]urchasing a Ticket without intending to fly all flights to gain lower fares (hidden cities)."[66]

Kiwi actively solicits customers to book these prohibited "hidden city" flights on Southwest, which Kiwi touts as a "travel hack."[67] But Southwest prohibits hidden city ticketing

---

[64] *See* Ex. A, Hursh Decl. ¶ 39 (App. 19-20).

[65] *See* Ex. D, Obrenic Decl. ¶ 10-28 (App. 432-438); *see* Exs. D-2 to D-17, Recent Records of Problems with Kiwi Hidden City Fares (App. 449-493).

[66] *See* Ex. D, Obrenic Decl. ¶ 11 (App. 432).

[67] *See* Ex. A, Hursh Decl. ¶ 13 (App. 32).

because of the logistical, operational, and customer service concerns that negatively impact Southwest's operations.[68] For example: (1) there are challenges at the airport with checked baggage because Southwest must check baggage to the ticketed, final destination, yet the customer intends to end their trip in the connecting city; (2) when a customer ends their trip in the connecting city, this presents a series of challenges for operational employees and flight crews trying to locate connecting customers that are listed on the connecting flight's manifest; (3) challenges arise in trying to locate connecting customers which lead to flight delays that negatively impact other passengers and disrupt Southwest flight schedule and on-time performance metrics.[69] Southwest has recently suffered multiple reportable flight delays caused by Kiwi's unauthorized sales of "hidden city" flights.[70] In addition, for every "hidden city" flight that Kiwi sells, Southwest misses out on the opportunity to sell an open seat on the second leg of the flight.

**E.      Before filing this lawsuit, Southwest sent Kiwi multiple cease-and-desist notices.**

In an attempt to stop Kiwi's unauthorized sales of Southwest flights, Southwest's Legal Department sent Kiwi a series of cease-and-desist notices, including a final notice in December 2020.[71] Kiwi specifically acknowledged receipt of one such cease-and-desist notice, but rather than halting its unlawful activity, Kiwi tried to solicit Southwest's leadership to form a business relationship.[72] On another occasion, in July 2020, after receiving multiple cease-and-desist notices from Southwest's Legal Department, Kiwi sent Southwest a report showing that between 2019 and the first half of 2020, Kiwi had generated €13,960,021 (equivalent to more than $17 million

---

[68] *See* Ex. D, Obrenic Decl. ¶ 12 (App. 433).

[69] *See* Ex. B, Buckley Decl. ¶¶ 4-6 (App. 90).

[70] *See* Ex. D, Obrenic Decl. ¶ 27 (App. 437).

[71] *See* Ex. A, Hursh Decl. ¶¶ 25-27 (App. 10-11); *see also* Exs. A-6 and A-7, Cease and Desist Notices (App. 63-81).

[72] *See* Ex. A, Hursh Decl. ¶ 27 (App. 11); *see also* Ex. A-8, Kiwi Email dated Sept. 11, 2019 (App. 83).

USD) in revenue from sales of Southwest flights related to more than 100,000 seats on Southwest flights.[73]

**F.    Money damages are inadequate to compensate for the ongoing injuries to Southwest's business and customers.**

Much of the harm caused by Kiwi cannot be easily quantified or remedied by money damages. For example, it is difficult to quantify the harm caused by: customers not receiving timely communications from Southwest; mishandled checked baggage; customers not receiving refunds from Kiwi; customers being charged unnecessary "add on" fees by Kiwi; customer confusion about Southwest's policies; and disruptions and delays caused by Kiwi's "hidden city" fares. At a minimum, Kiwi is damaging Southwest's business reputation, goodwill, and customer relationships. Moreover, given the substantial level of Kiwi's unauthorized activities (over 4,000 unauthorized bookings since this lawsuit was filed on January 14, 2021), the harm to Southwest and its customers is certain to continue unless this Court enters an injunction prohibiting Kiwi from promoting and selling Southwest flights.

### III.    ARGUMENTS AND AUTHORITIES

A party seeking a preliminary injunction must show (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) the injunction will not disserve the public interest.[74]

---

[73] *See* Ex. A, Hursh Decl. ¶ 28 (App. 11); *see also* Ex. A-9, Kiwi Email and Attachment, dated July 14, 2020 (App. 85-87).

[74] *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998) (citations omitted); *see also, Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir. 1991).

**A.      Southwest is likely to succeed on its breach of contract claim.**

To establish a breach of contract claim under Texas law, a plaintiff must prove (1) the existence of a valid contract; (2) the plaintiff's performance or tendered performance; (3) the defendant's breach of the agreement; and (4) the plaintiff's resulting damages.[75]

**1.      The Website Terms are a valid contract between the parties.**

This Court enforced Southwest's Website Terms in *Sw. Airlines Co. v. BoardFirst, L.L.C.*, 3:06-CV-0891-B, 2007 WL 4823761 (N.D. Tex. Sept. 12, 2007).[76] In analyzing whether a valid contract existed, Judge Boyle examined applicable law,[77] and explained that "the validity of a browsewrap license turns on whether a website user has actual or constructive knowledge of a site's terms and conditions prior to using the site."[78] There, the evidence showed "that BoardFirst has had knowledge of the Terms as early as when Kate Bell, BoardFirst's founder, received the December 20, 2005 cease-and-desist letter from Southwest."[79] Judge Boyle found that "BoardFirst bound itself to the contractual obligations imposed by the Terms" by continuing "to use the Southwest site in connection with its business" despite "actual knowledge of the Terms."[80]

---

[75] *BoardFirst,* 2007 WL 4823761, at *4 (citing *Dorsett v. Cross,* 106 S.W.3d 213, 217 (Tex.App.—Houston [1st Dist.] 2003, pet. denied)).

[76] *See id.* at *1.

[77] *See BoardFirst,* 2007 WL 4823761, at *4 ("The law is not concerned with the particular manner in which an offeree makes his assent known to the offeror provided that it is effectively communicated. *See Hollywood Fantasy Corp. v. Gabor,* 151 F.3d 203, 210 (5th Cir. 1998). Assent may be manifested directly, as by the written or spoken word, or indirectly, through one's actions or conduct. *See R.R. Mgmt. Co., L.L.C. v. CFS La. Midstream Co.,* 428 F.3d 214, 222 (5th Cir. 2005); *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.,* 480 S.W.2d 607, 609 (Tex. 1972).").

[78] *BoardFirst*, 2007 WL 4823761, at *5; *see also Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2nd Cir. 2004); *Cairo, Inc. v. Crossmedia Servs., Inc.*, 2005 WL 756610, at *5 (N.D. Cal. April 1, 2005) (finding that company's use of a website with knowledge of terms of use posted on the site constituted an acceptance of the terms).

[79] *Id.* at *4.

[80] *Id.* at *7.

The same is true here. Southwest sent multiple cease-and-desist notices to Kiwi's chief legal counsel, Kiwi's CEO, and to Kiwi's registered agents in the United States.[81] Southwest specifically referenced the Website Terms and attached a copy of the Website Terms, pointing out examples of how Kiwi's conduct violated the Website Terms.[82] Kiwi acknowledged receipt of one such cease-and-desist notice in September 2019.[83] When Kiwi continued "to use the Southwest [Website] in connection with [Kiwi's] business" with actual knowledge of the Website Terms, Kiwi "bound itself to the contractual obligations imposed by the [Website] Terms."[84]

Additionally, Kiwi has unlawfully used the Southwest Digital Platforms to book and sell over 170,000 Southwest flights for Kiwi's own commercial benefit.[85] For each purchase, Kiwi affirmatively accepted the Website Terms,[86] making the Website Terms a valid contract between the parties.[87] Moreover, in connection with its unauthorized sales of Southwest flights, Kiwi specifically acknowledges that: "All services provided by Southwest Airlines are subject to their Terms and Conditions. More information is available on their website."[88] Accordingly, the Website Terms constitute a valid contract between Southwest and Kiwi.

---

[81] *See* Ex. A, Hursh Decl. ¶¶ 25-27 (App. 10-11); *see also* Exs. A-6 and A-7, Cease and Desist Notices (App. 63-81).

[82] *See* Ex. A-6, Cease and Desist Notice (App. 63-77).

[83] *See* Ex. A-8, Kiwi Email dated Sept. 11, 2019 (stating "I've just been passed the Cease & Desist letter from your side") (App. 83).

[84] *BoardFirst*, 2007 WL 4823761, at *7.

[85] *See* Ex. C, Andorf Decl. ¶¶ 3-6 (App. 170-171); Ex. C-1 to C-5,  PNR Records for Kiwi Bookings Since Aug. 1, 2020 (App. 175-428).

[86] *See* Ex. A, Hursh Decl. ¶¶ 21, 47 (App. 8, 22).

[87] *See, e.g., Nevarez v. Forty Niners Football Co., LLC*, 16-CV-07013, 2017 WL 3492110, at *9 (N.D. Cal. Aug. 15, 2017); *Ticketmaster L.L.C. v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1107 (C.D. Cal. 2007).

[88] *See* Ex. A, Hursh Decl. ¶ 29 (App. 11-12).

### 2.    Southwest performed its obligations under the Website Terms.

Southwest performed its obligations under the Website Terms by, among other things, making the Southwest Website and its contents available to Kiwi under "a limited, non-exclusive, revocable, non-assignable, personal, and non-transferable license to download, display, view, use, play the Company Information on a personal computer, browser, laptop, tablet, mobile phone or other Internet-enabled device (each, a 'Device') and/or print one copy of the Company Information as it is displayed to you, in each case for your personal, non-commercial use only."[89]

### 3.    Kiwi breached the Website Terms.

Kiwi breached the Website Terms by, among other things, harvesting and scraping Southwest flight data and fares from the Southwest Website, presenting Southwest flight data and fares on kiwi.com, and selling Southwest flights and ancillary services through kiwi.com without permission from Southwest.[90] Even since the filing of this lawsuit, Kiwi continues to: scrape data form the Southwest Website; offer and sell Southwest flights for Kiwi's own commercial benefit; charge extra service fees that are not collected by Southwest; and misrepresent to consumers that Southwest flights purchased through kiwi.com are noncancellable, nonrefundable, or subject to change fees.[91] All of this conduct violates the Website Terms and constitutes a breach of contract by Kiwi.

### 4.    Kiwi's breaches have caused Southwest to suffer damages.

As detailed above and in supporting declarations, Southwest has suffered harm as a result of Kiwi's breach of the Website Terms, including reputational damage and loss of goodwill from customer complaints; increased customer service burdens; disruptions to operations from "hidden

---

[89] Ex. A-3, Website Terms at 1-2 (App. 40-41).

[90] *See* Ex. A, Hursh Decl. ¶ 26 (App. 10).

[91] *See* Ex. A, Hursh Decl. ¶¶ 30-44, 48-50, 52-54 (App. 12-23, 28-29).

city" passengers, which throw off headcounts, cause delays, and cause baggage handling problems; and lost traffic and sales on the Southwest Website.[92] Although such damages are absolutely harmful to Southwest's business, much of this harm is difficult to quantify or compensate with money damages. For example, it is difficult to know precisely how many Kiwi customers otherwise would have visited the Southwest Website, purchased a flight directly from Southwest, or purchased ancillary services from Southwest. Perhaps more importantly, Southwest suffers harm from Kiwi's shady business practices, poor customer service, interference with passenger communications, and misrepresentation of Southwest policies, all of which are damaging Southwest's reputation and customer goodwill. While it is difficult to quantify all the specific damages Southwest has incurred due to Kiwi's unauthorized sales of Southwest flights, the evidence shows that those injuries are real and ongoing.

Texas courts recognize a distinction between uncertainty about the *fact* that damages have been sustained and uncertainty as to their *amount*.[93] "A party who breaks his contract cannot escape liability because it is impossible to state or prove a perfect measure of damages."[94] Moreover, under Texas law, a plaintiff's failure to prove actual damages stemming from a breach of contract does not prevent recovery so long as there is proof that a contract was formed and breached.[95] For all of these reasons, Southwest is likely to succeed on the merits of its breach of contract claim.

---

[92] *See* Ex. A, Hursh Decl. ¶¶ 7-18, 48 (App. 3-7, 16, 22-23); Ex. B, Buckley Decl. ¶¶ 9-17 (App. 91-99); Ex. D, Obrenic Decl. ¶¶ 10-28 (App. 432-438); *see* Ex. D-2 to D-17, Recent Records of Problems with Kiwi Hidden City Fares (App. 449-493).

[93] *BoardFirst,* 2007 WL 4823761, at *10.

[94] *Id.* (quoting *Sw. Battery Corp. v. Owen*, 115 S.W.2d 1097, 1099 (Tex. 1938)).

[95] *Id.* (citing *e.g., Fisher v. Westinghouse Credit Corp.*, 760 S.W.2d 802, 808 (Tex. App.—Dallas 1988, no writ)).

**B.**    **Southwest and its customers will continue to suffer irreparable injuries if the injunction is denied.**

Under Texas law, irreparable harm is "an injury which cannot be compensated or for which compensation cannot be measured by any certain pecuniary standard."[96] "It is settled law in Texas that performance of a contract may be specifically enforced by an injunction restraining acts in violation of the contract, such being, in effect, a negative decree of specific performance."[97] "[E]ven in a private contract dispute [courts] are required [] to take into account the vital public interest which may be in jeopardy."[98] Courts have found irreparable harm exists when, such as here, public consumers will be deceived and overcharged for services absent the injunction.[99] Moreover, a likelihood of lost business opportunities, lost market share, loss of reputation, and loss of customer goodwill is sufficient to show irreparable harm.[100] Because such

---

[96] *BoardFirst*, 2007 WL 4823761, at *10 (citing *Parkem Indus. Servs., Inc. v. Gorton,* 619 S.W.2d 428, 430 (Tex. Civ. App.—Amarillo 1981, no writ)).

[97] *Id.* (citing *Fuller v. Walter E. Heller & Co*., 483 S.W.2d 348, 351 (Tex. Civ. App.—Dallas 1972, no writ); *MW Petroleum Corp. v. Exxon Corp*., 1997 WL 634159, at *4 (Tex. App.—Houston [14th Dist.] Oct. 16, 1997, no writ)).

[98] *Miss. Power & Light Co. v. United Gas Pipe Line Co*., 760 F.2d 618, 627 (5th Cir. 1985); *see also BoardFirst*, 2007 WL 4823761, at *18 ("[T]he public has an interest in seeing contractual arrangements enforced.").

[99] *Miss. Power*, 760 F.2d at 627 (affirming injunctive relief and finding irreparable harm because public would be overcharged for services and consumers injured would not be adequately compensated).

[100] *Le-Vel Brands, LLC v. Bland*, No. 3:19-CV-00154-L, 2019 WL 4753041, at *9 (N.D. Tex. Sept. 30, 2019)(making negative statements about a competitor while soliciting customers of the competitor "could cause irreparable damage to its business, goodwill, and reputation," especially when considering the defendant "gave no indication [] that he intended to cease his conduct, despite his awareness that he was violating the agreement."); (*Sparrow Barns & Events, LLC v. Ruth Farm Inc*., No. 4:19-CV-00067, 2019 WL 1560442, at *8 (E.D. Tex. Apr. 10, 2019) ("The injury to Sparrow Barn's control of its [] customer goodwill, reputation, and potential loss of customers and vendors is difficult to quantify and likely cannot be fully compensated with monetary remedies."); *Redi-Mix Sols., Ltd. v. Express Chipping, Inc*., No. 6:16-CV-298-RWS-KNM, 2016 WL 7634050, at *10 (E.D. Tex. Dec. 2, 2016), report and recommendation adopted, No. 6:16-CV-298-RWS-KNM, 2017 WL 26083 (E.D. Tex. Jan. 3, 2017) ("[T]he threat of loss of goodwill with customers [is] sufficient to establish irreparable harm."); *Pfeiffer v. Ajamie PLLC*, 469 F. Supp. 3d 752, 764 (S.D. Tex. 2019); *Valvtechnologies, Inc. v. North*, No. CIV.A. H-10-3943, 2011 WL 649651, at *4–5 (S.D. Tex. Feb. 10, 2011); *c.f., Celsis In Vitro, Inc. v. CellzDirect, Inc*., 664 F.3d 922, 930 (Fed. Cir. 2012) ("Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." "There is no effective way to measure the loss of sales or potential growth—to ascertain the people who do not knock on the door or to identify the specific persons who do not reorder because of the existence of the infringer.").

damages are not easily quantified, monetary damages are inadequate and irreparable harm exists.[101]

1.      **Southwest's reputational damage and loss of customer goodwill is irreparable.**

Absent an injunction, Kiwi's ongoing unauthorized sales of Southwest flights will continue to cause Southwest and its customers to suffer irreparable harm. Southwest has spent decades and considerable resources building a reputation for customer service. Customers who purchase Southwest flights from Kiwi have and will continue to associate Kiwi's poor customer service in connection with travel on Southwest, causing irreparable damage to Southwest's reputation. This harm, while evident, is difficult to quantify with precision. Southwest cannot readily ascertain how many customers who, after negative experiences with Kiwi, will refuse to book flights with Southwest in the future. Thus, monetary damages are inadequate to compensate Southwest for these injuries. And under *Mississippi Power & Light*, a "vital public interest" is "in jeopardy"[102] because customers will continue to be deceived and overcharged for services absent an injunction.[103]

2.      **Kiwi's sale of Southwest flights diverts traffic from the Southwest Website and causes Southwest to suffer lost ancillary sales and business opportunities.**

As the Federal Circuit has observed, "[t]here is no effective way to measure the loss of sales or potential growth—to ascertain the people who do not knock on the door or to identify the specific persons who do not re[purchase] because of the existence of the [wrongdoer]."[104] Without

---

[101] *Millennium Rests. Grp., Inc. v. City of Dallas*, 181 F.Supp.2d 659, 666 (N.D. Tex. 2001).

[102] 760 F.2d at 627; *see also*, *BoardFirst*, 2007 WL 4823761, at *18 ("[T]he public has an interest in seeing contractual arrangements enforced.").

[103] *Miss. Power,* 760 F.2d at 627 (affirming injunctive relief and finding irreparable harm where public would ultimately be overcharged for services and that administrative problems precluded any possibility that consumers injured would be adequately compensated).

[104] *C.f., Celsis In Vitro, Inc.*, 664 F.3d at 930 ("Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm.").

question, Southwest derives a substantial commercial benefit from requiring its flights be sold directly through the Southwest Website. First, Southwest is able to control the customer experience and provide exceptional customer service. Second, Southwest is able to cross-sell ancillary services to customers. Third, customers who visit the Southwest Website are more likely to explore the site, become Rapid Rewards members, and buy additional fares. Fourth, even when website traffic does not immediately lead to a purchase, the direct visits to the Southwest Website are valuable in leading to future customer purchases. In that regard, customers' repeated visits and exposure to the Southwest brand are valuable in establishing customer rapport to support potential future sales, provided that the experience is not tarnished by association with Kiwi's reportedly F-rated, worst-in-the-industry, refund-scamming practices.

By diverting customers from the Southwest Website, Kiwi is negatively affecting visit frequency, purchasing, customer retention, and long-term loyal customers, which therefore affects the entire Southwest brand and company. This harm cannot be readily calculated. Kiwi's ongoing conduct—even after the filing of this lawsuit—shows that Kiwi has no intention of stopping its unauthorized sales of Southwest flights unless this Court enters an injunction.[105]

## C.   The ongoing harm to Southwest and its customers outweighs any possible damage that the injunction might cause to Kiwi.

On one hand, Kiwi's business takes advantage of unsuspecting customers by selling them inflated Southwest fares with unnecessary "add on" services, which is harmful to Southwest and the public. Kiwi's business practices interfere with important customer communications, prevent proper customer refunds, misrepresent Southwest's customer-friendly policies, charge customers

---

[105] *See Enter. Int'l v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472-73 (5th Cir. 1985) (explaining that an injury is irreparable if it cannot be undone through monetary remedies); *see also, Foxtrap, Inc. v. Foxtrap, Inc.*, 671 F.2d 636, 639 (D.C. Cir. 1982) ("It is difficult to imagine an unfair competition case where damages are adequate to remedy the problem of defendant's continued acts.").

unnecessary booking and customer service fees, divert traffic flow away from the Southwest Website, and tarnish Southwest's reputation and goodwill. Though perhaps unquantifiable, these injuries are real and substantial.

By comparison, Kiwi will suffer little if any damage by ceasing its unauthorized sales of Southwest flights. No unauthorized OTA is permitted to sell Southwest's flights. And Kiwi can continue to operate its business and sell flights for other carriers. But under federal law, Kiwi has no legal right to scrape data from the Southwest Website and sell Southwest flights without permission.[106] Kiwi has no right to violate Southwest's Website Terms. And Kiwi's interest in using the Southwest Website for its own commercial purposes is entitled to scant consideration,[107] and cannot outweigh Southwest's legitimate interests in protecting customers, protecting its reputation, and maximizing its own selling opportunities.[108] Simply put, the equities of the situation dictate that Kiwi's unauthorized sales of Southwest flights must stop now.[109]

## D.   An injunction prohibiting Kiwi's unauthorized sales of Southwest flights will serve the public interest.

The public interest will be served by the issuance of an injunction in this matter because it will protect consumers and uphold the rule of law. Kiwi's unauthorized sales of Southwest flights and dubious business practices put consumers at risk.[110] The public has a right not to be confused

---

[106] *See* 14 C.F.R. § 256.6 ("Nothing in this section requires an air carrier, foreign air carrier, or ticket agent to allow a system to access its internal computer reservation system or to permit 'screen scraping' or 'content scraping' of its Web site; nor does it require an air carrier or foreign air carrier to permit the marketing or sale of the carrier's services through any ticket agent or other carrier's system. 'Screen scraping' as used in this paragraph refers to a process whereby a company uses computer software techniques to extract information from other companies' Web sites without permission from the company operating the targeted Web site.").

[107] *Jiffy Lube Int'l, Inc. v. Weiss Bros. Inc.*, 834 F. Supp. 683, 693 (D.N.J. 1993).

[108] *BoardFirst,* 2007 WL 4823761, at *18.

[109] *Urgent Gear, Inc. v. Savoia*, 3:01-CV-2190-D, 2001 WL 1577395, at *16-17 (N.D. Tex. Dec. 10, 2001) ("given [defendant's] intentional infringement, the court held that the potential injury of no relief to [plaintiff] outweighs any potential damage of such relief to defendants.").

[110] *BoardFirst*, 2007 WL 4823761, at *18.

or defrauded as to the amount or source of the services offered for Southwest flights. The evidence shows that customers have been harmed by Kiwi's unauthorized sales of Southwest flights and that such injuries will continue unless an injunction is entered. Moreover, customers are likely to believe that Southwest has authorized, approved, or endorsed Kiwi's sales of Southwest flights, which is not true. Further, the public has an interest in enforcing the law and upholding contractual agreements.[111] The public interest will be served by an injunction in this case.

## IV.   CONCLUSION

Kiwi's unauthorized sales of Southwest flights are causing Southwest and its consumers to suffer irreparable injuries. Judicial intervention is necessary to bring Kiwi's harmful and unlawful activities to a halt. Southwest requests that this Court issue a preliminary injunction enjoining Kiwi and its agents, servants, employees, and those people in active concert or participation with them from harvesting or scraping Company Information from the Southwest Digital Platforms, republishing, offering, or selling Southwest flights and related services, and otherwise violating the Website Terms. Southwest also requests such other and further relief to which it may show itself to be justly entitled.

---

[111] *Miss. Power*, 760 F.2d at 627; *BoardFirst*, 2007 WL 4823761, at *18 ("[T]he public has an interest in seeing contractual arrangements enforced.").

Dated: February 24, 2021    Respectfully submitted,

By: */s/ Michael C. Wilson*
  Michael C. Wilson
  Texas State Bar No. 21704590
  mwilson@munckwilson.com
  S. Wallace Dunwoody
  Texas Bar. No. 24040838
  wdunwoody@munckwilson.com
  Amanda K. Greenspon
  Florida Bar No. 1014584
  agreenspon@munckwilson.com
  Julie M. Christensen
  Texas State Bar No. 24105601
  jchristensen@munckwilson.com
  **MUNCK WILSON MANDALA, LLP**
  12770 Coit Road, Suite 600
  Dallas, Texas 75251
  Telephone: (972) 628-3600

  **ATTORNEYS FOR PLAINTIFF**
  **SOUTHWEST AIRLINES CO.**

## CERTIFICATE OF CONFERENCE

I personally conferred with Kiwi's counsel on February 23, 2021, regarding the relief sought by this motion. Kiwi is opposed to halting its unauthorized scraping of Southwest data, sales of Southwest flights, and other relief sought by this motion.

      */s/ Michael C. Wilson*
      Michael C. Wilson

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record by ECF on February 24, 2021.

      */s/ Michael C. Wilson*
      Michael C. Wilson

876814