IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SOUTHWEST AIRLINES CO., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:21-cv-00098-E |
| | § | |
| KIWI.COM, INC. AND KIWI.COM S.R.O., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Plaintiff Southwest Airlines Company's Motion for Preliminary Injunction (Doc. 18). After careful consideration, for reasons that follow, the Court grants the motion.

**Background**

Southwest filed this lawsuit against Defendants Kiwi.com, Inc. and Kiwi.com s.r.o. (collectively "Kiwi") in January 2021. The following allegations are taken from Southwest's First Amended Complaint. Since it began operating in 1971, Southwest has become one of the most-flown airlines in the United States, with more than 4,000 daily departures in peak travel seasons in 2019. Southwest maintains unique customer-friendly policies, including a "Bags Fly Free" policy (each customer can check two bags for free, subject to weight and size limits) and a "No Change Fees" policy (Southwest does not charge fees to change or cancel flights, though fare differences may apply).

Southwest offers and sells flights to the public through its website at www.southwest.com and its mobile application (collectively, "Southwest Digital Platforms"). Southwest maintains the

1

exclusive online distribution rights to sell Southwest tickets through the Southwest Digital Platforms and does not allow online travel agencies ("OTAs") to sell Southwest flights without express written approval.  The Southwest Digital Platforms provide links to the "Terms and Conditions" for use of the Southwest website ("the Terms"), which govern use of the Southwest Digital Platforms.  Users are alerted that "Use of the Southwest websites and our Company Information constitutes acceptance of our Terms & Conditions."  The Terms expressly prohibit attempts to "page scrape" flight data and use of the website for any commercial purpose without authorization from Southwest.

Southwest alleges that Kiwi operates an OTA and has engaged in repeated, unlawful activity on the Southwest website, including unauthorized scraping of flight and pricing data and unauthorized sales of Southwest tickets.  According to Southwest, Kiwi purchased tickets directly from Southwest's website and then resold the flights to over 170,000 customers.  Southwest alleges Kiwi inflates Southwest fares and charges service fees that are not collected by Southwest. Southwest has sent written cease-and-desist demands in emails and letters to Kiwi's chief legal counsel and registered agents in the United States referencing the Terms.  Kiwi has ignored the cease-and-desist letters.  Southwest alleges that since filing this suit, it has implemented security measures in an effort to stop Kiwi's activities, but Kiwi has continued to hack the Southwest website and sell Southwest flights without permission.

Southwest asserts the following causes of action:  (1) breach of contract/the Terms; (2) trademark infringement under 15 U.S.C. § 1114; (3) false designation of origin and unfair competition under 15 U.S.C. § 1125(a); (4) dilution under 15 U.S.C. § 1125(c); (5) violation of the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030; (6) violation of the Texas Harmful Access by Computer Act; and (7) unjust enrichment.  Southwest asks the Court for a preliminary

injunction prohibiting Kiwi's unauthorized sales of its flights.  Southwest argues it is likely to succeed on the merits of its breach of contract claim and can establish the remaining requirements for injunctive relief.

Kiwi acknowledges it has been collecting and publishing Southwest's flight data for over seven years, but disputes that Southwest is entitled to injunctive relief.  Kiwi argues Southwest has been aware of Kiwi's activities since September 2015, when it sent a cease-and-desist letter to Kiwi's predecessor Skypicker.  According to Kiwi, Southwest's five-year-plus delay in seeking an injunction means Southwest cannot obtain injunctive relief.

**Applicable Law**

The purpose of a preliminary injunction is "merely to preserve the relative positions of the parties until a trial on the merits can be held."  *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  A preliminary injunction is an extraordinary remedy that should be granted only if the movant establishes (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest.  *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 536–37 (5th Cir. 2013); *see also* FED. R. CIV. P. 65.  "The decision to grant or deny a preliminary injunction is discretionary with the district court."  *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985).  A plaintiff is not required to prove its entitlement to summary judgment in order to establish a substantial likelihood of success on the merits for preliminary injunction purposes.  *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009).  But the movant must make a clear showing that the injunction is warranted, and the issuance of a

preliminary injunction "is to be treated as the exception rather than the rule." *Miss. Power & Light*, 760 F.2d at 621.

## Analysis

### *Success on the Merits*

Southwest contends it is likely to succeed on its breach of contract claim. It maintains the Terms of its website are a valid contract between the parties.

To establish a breach of contract claim under Texas law, a plaintiff must prove (1) the existence of a valid contract; (2) the plaintiff's performance or tendered performance; (3) the defendant's breach of the agreement; and (4) the plaintiff's resulting damages. *Southwest Airlines Co. v. BoardFirst, L.L.C.*, No. 3:06-CV-0891-B, 2007 WL 4823761, at *4 (N.D. Tex. Sept. 12, 2007) (Boyle, J.) (citing *Dorsett v. Cross,* 106 S.W.3d 213, 217 (Tex. App.—Houston [1st Dist.] 2003, pet. denied)). Southwest asserts this Court should find that Kiwi is contractually bound by the Terms just as another district judge in the Northern District of Texas found in the *BoardFirst* case.

In *BoardFirst*, Southwest sued BoardFirst for allegedly violating the terms and conditions of Southwest's website. *BoardFirst*, 2007 WL 4823761, at *1. BoardFirst's business was to assist, for a fee, Southwest passengers in securing boarding passes with a high priority boarding group. It did so by logging onto Southwest's website to check passengers in. *Id.* Southwest sent cease-and-desist letters to BoardFirst apprising it that Southwest's terms and conditions prohibit the use of its website for commercial purposes. *Id.* at *2. When BoardFirst continued operations, Southwest filed a lawsuit alleging breach of contract and other claims. In seeking summary judgment on its contract claim, Southwest argued the terms of its website created a binding contract with BoardFirst once BoardFirst began using the website with knowledge of the terms. *Id.* at *4.

4

The district court found that BoardFirst had knowledge of the terms at the time its founder received the first cease-and-desist letter from Southwest. *Id.* Southwest asserted that BoardFirst effectively manifested its acceptance of Southwest's offer to use the website subject to the terms by continuing to use the website after having actual knowledge of the terms. The district court agreed and ruled that BoardFirst was bound by the contractual obligations imposed by the terms. *Id.* at *7.

Kiwi responds that in the fourteen years since the *BoardFirst* case was decided, the law has "shifted significantly." Kiwi argues that "Courts, scholars, and commentators broadly agree there is a clear distinction between public and private data, and that private companies cannot unilaterally restrict public access to publicly available information." Kiwi asserts the leading federal precedent on the accessibility of public data is a Ninth Circuit case, *hiQ Labs v. LinkedIn*, 938 F.3d 985 (9th Cir. 2019). LinkedIn, the professional networking website, sought to prevent competitor hiQ from collecting and using information from the public profiles of LinkedIn users. The district court granted hiQ's request for a preliminary injunction, forbidding LinkedIn from denying hiQ access to publicly available LinkedIn member profiles. The appellate court considered, among other things, whether hiQ's state law claims were preempted by the CFAA which LinkedIn argued hiQ violated. *Id.* at 999. The CFAA states that whoever intentionally accesses a computer without authorization or exceeds authorized access and obtains information from any protected computer shall be punished by fine or imprisonment. 18 U.S.C. § 1030(a)(2)(C). In *hiQ*, the "pivotal CFAA question" was whether once hiQ received LinkedIn's cease-and-desist letter, any further scraping and use of LinkedIn's data was without authorization under the meaning of the CFAA. *hiQ*, 938 F.3d at 999. If so, hiQ could not succeed on any of its state law claims and was not entitled to a preliminary injunction. *Id.* The Ninth Circuit upheld the preliminary injunction, finding it likely that when a computer network generally permits public

access to its data, a user's accessing that publicly available data will not constitute access without authorization under the CFAA's prohibition on accessing a computer without authorization. *Id.* at 1003. The Ninth Circuit noted, however, that entities that view themselves as victims of data scraping are not without resort; they may have other causes of action, including breach of contract. *Id.* at 1004. Recently, the United States Supreme Court vacated the judgment in *hiQ* and remanded the case to the Ninth Circuit for further consideration in light of *Van Buren v. U.S.*, 141 S. Ct. 1648 (2021). *LinkedIn Corp. v. hiQ Labs, Inc.*, No. 19-1116, 2021 WL 2405144 (June 14, 2021); *see Van Buren*, 141 S. Ct. at 1662 (holding that individual exceeds authorized access when he accesses computer with authorization but then obtains information located in particular areas of computer, such as files, folders, or databases, that are off limits to him).

The Court is not persuaded the *hiQ* case means that Southwest cannot establish a likelihood of success on the merits for its breach of contract claim. *hiQ* involved whether a preliminary injunction was appropriate under the CFAA. The opinion acknowledges a plaintiff could have a breach of contract claim even in the absence of a CFAA violation. Further, the Supreme Court recently vacated the *hiQ* judgment and remanded for further consideration in light of new authority on the application of the CFAA.

Kiwi also argues that Southwest has not shown Kiwi's "reasonable manifestation of assent" to the Terms. Kiwi contends its conduct did not reflect its intent to be bound by the Terms because Kiwi was not acting in accordance with the contract terms. In other words, conduct that inherently constitutes a breach cannot show assent to a contract's terms. Kiwi has not directed the Court to any case law that it finds persuasive on this argument under the facts of this case. *See SK Plymouth, LLC v. Simmons*, 605 S.W.3d 706, 718 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (cited for proposition that party's intent to be bound by contract may be evidenced by conduct reflecting that

it was acting in accordance with terms of contract); *Effel v. McGarry*, 339 S.W.3d 789, 792 (Tex. App.—Dallas 2011, pet. denied) (cited for proposition that in breach of contract case, assent can be implied, but conduct must reflect agreement to contract alleged).  As Southwest notes, none of the cases Kiwi cites support the idea "that an immediate breach negates assent."

Kiwi has purchased over 20,000 flights on the Southwest Digital Platforms.  In connection with its sales of Southwest flights, Kiwi specifically acknowledges that: "All services provided by Southwest Airlines are subject to their Terms and Conditions. More information is available on their website."  The Terms are hyperlinked at the bottom of each page of Southwest's website with a statement that use of the website constitutes acceptance of the Terms. For all online purchases, the user must affirmatively acknowledge and accept the Terms by clicking a button that states: "By clicking 'Purchase,' I agree to the Terms and Conditions below, the privacy policy, and the contract of carriage," which appears just above a yellow "Purchase" button with hyperlinks to the Website Terms, Privacy Policy, and Contract of Carriage.  For each purchase, Kiwi affirmatively accepted the Terms.  Southwest sent multiple cease-and-desist notices to Kiwi's chief legal counsel, Kiwi's CEO, and to Kiwi's registered agents in the United States.  Southwest specifically referenced the Terms and attached a copy of them, pointing out examples of how Kiwi's conduct violated the Terms. Kiwi acknowledged receipt of one such cease-and-desist notice in September 2019. As in *BoardFirst*, when Kiwi continued to use the Southwest website in connection with Kiwi's business with actual knowledge of the Terms, Kiwi "bound itself to the contractual obligations imposed by the Terms."  *See BoardFirst*, 2007 WL 4823761, at *7.

The Court finds Southwest has established the existence of a valid contract.  It has also demonstrated the other elements of a breach of contract.  Southwest performed its obligations under the Terms. Kiwi breached the Terms by scraping Southwest flight data and fare from

Southwest's website, presenting Southwest flight data on kiwi.com, and selling Southwest flights without authorization.  As will be discussed more below, Kiwi's breaches have caused Southwest to suffer damages, including damage to its reputation and loss of goodwill from customer complaints and increased customer service burdens and disruption to operations.

Kiwi maintains it has affirmative defenses that make it unlikely Southwest can prevail on a breach of contract claim.  If the plaintiff demonstrates, as Southwest has, it is likely to succeed on its claim, the defendant may refute that by showing it is likely to succeed on an affirmative defense.  *Janvey v. Alguire*, No. 3:09-CV-724-N, 2010 WL 11619267, at *6 (N.D. Tex. June 10, 2010) (Godbey, J.) (citing *Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal*, 546 U.S. 418, 429 (2006) ("the burdens at the preliminary injunction stage track the burdens at trial")).

Here, while Kiwi mentions Southwest's delay in seeking an injunction often in its briefing, the entirety of Kiwi's legal argument and authority regarding the affirmative defense of laches, as well as the affirmative defense of unconscionability, is as follows:

> Given Southwest's years-long delay, both laches and limitations present serious obstacles, evidence on the face of the complaint, to showing it will succeed in procuring permanent injunctive relief.  *See, e.g., Abraham v. Alpha Chi Omega*, 708 F.3d 614, 626 (5th Cir. 2013) ("There is no doubt that laches may defeat claims for injunctive relief[.]"). Equally, the adhesionary nature of Southwest's Terms and Conditions, its overreaching and selective enforcement against competitors in the service of a consumer-harming monopoly on flight and fare data, and the overwhelming public interest in preserving the freedom to discuss publicly available information raise serious questions about unconscionability.  *See, e.g., Ski River Dev., Inc. v. McCalla*, 167 S.W.3d 121, 135–39 (Tex. App.—Waco 2005, pet. denied) (voiding contract in light of evidence of "unfair bargaining positions, unfair terms, gross disparity in the value exchanged," and other aspects of substantive and procedural unconscionability).

The Court concludes Kiwi has not met its burden on its affirmative defenses at this stage.

*Irreparable Injuries*

Next, Southwest must show it will suffer irreparable injuries if a preliminary injunction is not issued.  An injury is irreparable only if it cannot be undone through monetary remedies. *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985).

Southwest's evidence in support of its motion indicates it does not allow its flights to be published or sold on OTA websites.  This approach allows Southwest "to deal directly with its customers, control the customer experience, ensure customer satisfaction, protect customers from misinformation, control costs, and promote other travel services like hotels and car rentals." Southwest communicates with its customers via email or text at various points before a flight. Each communication is tailored to provide relevant information about any changes related to the trip.  When Kiwi books a Southwest flight, it does not include the customer's email address or phone number, which interferes with direct customer notifications from Southwest.  Southwest is unable to communicate directly with the booked customer about flight schedule revisions or other information.

In addition, Southwest has shown that Kiwi's unauthorized sales of Southwest's flights divert customers away from Southwest's website, misrepresent Southwest's policies and procedures, provide false booking information, upcharge customers fees for services and features that Southwest offers for free, and encourage customers to book "hidden city" fares in violation of Southwest's Contract of Carriage.  For example, Kiwi advertises some Southwest flights as a "no-checked-bag itinerary," but all Southwest fares include two free checked bags.  Further, when Kiwi completes a reservation of a Southwest flight, Southwest is negatively impacted because it loses

the ability to market or sell its EarlyBird Check-in service to its customers and is unable to offer "value added services such as car rental deals, hotel deals, or deals for future travel."

Southwest does not permit hidden city fares.  A hidden city fare is when a passenger's *intended* final destination is not the *ticketed* final destination, but instead a connecting city.  In other words, the passenger purchased a ticket from City 1 to City 2 to City 3, but does not travel beyond City 2.  Southwest's Contract of Carriage prohibits purchasing a ticket without intending to fly all flights to gain lower fares.  Kiwi presents hidden cities to its customers as a "travel hack," i.e., a way to save money.

The declaration of Southwest's Senior Manager–Standards & Compliance in the Ground Operations Department, Biljana Obrenic, states that Southwest prohibits this practice because of logistical, operational, and public safety concerns.  The practice negatively affects Southwest's ability to estimate passenger headcounts, causes disruptions at the airport gate, and requires maintenance adjustments, such as variations in the amount of fuel needed.  Attached to Obrenic's declaration are operational records demonstrating some of the impact of hidden city fares.  The challenges include passenger confusion about why they have received two boarding passes instead of one and airport managers trying to locate Kiwi passengers for the connecting flight.  In addition, Southwest requires bags to be checked to the final destination.  For the hidden city fares, there is confusion when passengers try to check bags to their final destination, the connecting city. According to Obrenic, Southwest has been forced to take multiple flight delays due to operational challenges arising from Kiwi passengers traveling on a hidden city ticket.

After the briefing on the motion for preliminary injunction and opposition was complete, Kiwi filed a stipulation regarding hidden city fares.  Without conceding that such fares are unlawful or are harming Southwest, "to assist the Court in deciding the motion for preliminary injunction

by narrowing the number and scope of issues under consideration," Kiwi stipulated that as of April 29, 2021, it ceased advertising or brokering the sale of itineraries that include a hidden city flight segment on Southwest.  It also stipulated it will continue to do so until final resolution of this suit.

Southwest asserts Kiwi's unauthorized sales of its flights have led to a flood of customer complaints.  A Senior Director in the Customer Relations Department at Southwest, Michelle Buckley, states that her department utilizes computer systems to track customer inquiries.  Buckley attached records from Southwest's customer relations database to her declaration.  According to Buckley, the records show hundreds of complaints and issues related to flight purchases, travel experiences, or refund requests for trips booked through Kiwi.  Complaints include customers not receiving notice about schedule changes or delays, customers unable to make changes or cancellations to reservations, customers confused about baggage policies and fees charged by Kiwi, and customers blaming Southwest for Kiwi's conduct.

The declaration of Mark Hursh, a Director in the Marketing Department at Southwest, indicates Kiwi's conduct is harmful to Southwest's business and customers.  Hursh states that Kiwi's conduct damages Southwest's business reputation, customer relationships, and goodwill. According to Hursh, because of the nature of the harm, it is difficult to quantify the precise amount of financial harm caused by Kiwi's conduct.  For example, it is difficult to calculate the amount of money damages to Southwest caused by interference with customer communications, disruptions to flight schedules, increased costs for baggage handling and customer services, and for the injuries caused by misrepresentations concerning Southwest policies.  In addition, it is difficult to know how much Kiwi customers might have spent on ancillary services offered by Southwest on its digital platforms.

Kiwi argues that Southwest cannot show irreparable harm for four reasons:  1) Southwest's delay in seeking relief means any harms it faces are not irreparable; 2) Southwest cannot justify an injunction by invoking harms to third parties, its passengers; 3) Southwest cannot justify an injunction based on harms that are "mere incidents of market competition;" and 4) Southwest's "remaining harms," which Kiwi identifies as potential lost goodwill and the effects of hidden city tickets, are not irreparable.

On the issue of delay, Kiwi argues Southwest has been aware of its activities since at least September 2015, when it sent a cease-and-desist letter to Kiwi's predecessor Skypicker.  Kiwi maintains Southwest's delay in seeking an injunction shows that any harm caused by Kiwi's conduct is not irreparable.

Southwest responds that it did not unreasonably delay.  Southwest points out that Skypicker did not respond to its letters and Kiwi responded for the first time in September 2019.  Southwest contends the situation changed fundamentally in late 2020, when Southwest received escalating reports from personnel in ground operations and customer service about angry customers not receiving refunds and disruptive hidden city fares.  These complaints arose from Kiwi bookings. Southwest maintains it promptly took action.  Its December 2020 cease-and-desist letter was the first sent to Kiwi.com, Inc.  Southwest says there is substantial evidence that reputational problems surfaced in late November 2020.  Southwest argues an injunction is necessary now as a result of recent problems.  The February 2021 declaration of Obrenic states that problems related to Southwest flights purchased through Kiwi have recently been increasing.  In recent months, employees have submitted reports or notified supervisors about operational problems arising from passengers with Kiwi reservations.  The complaints documented in the declaration are from late 2020 to early 2021 and support Southwest's position that the harm caused by Kiwi escalated

12

recently. Southwest also points to multiple recent flight delays due to reservations associated with Kiwi passengers. The Court is not persuaded that the cases Kiwi cites mandate the denial of injunctive relief in this case. *See, e.g., Dillard v. Sec. Pac. Corp.*, 85 F.3d 621, 1996 WL 254971, at *4 (5th Cir. Apr. 18, 1996) (per curiam) (plaintiff could not prove irreparable injury in part because he waited almost six years to request injunctive relief; he also could not prove substantial likelihood of success on merits); *Leaf Trading Cards, LLC v. Upper Deck Co.*, No. 3:17-CV-3200-N, 2019 WL 7882552, at *2 (N.D. Tex. Sept. 18, 2019) ("Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction."). Here, Southwest has demonstrated a substantial likelihood of success on the merits of its contract claim and has provided a reasonable explanation for its alleged delay.

As for Kiwi's remaining arguments on the issue of irreparable harm, the Court notes that Southwest has not only alleged harm to third parties, it points to harm to its business operations. And the Court does not agree the alleged unauthorized sales of Southwest flights amount to mere incidents of market competition. As for Kiwi's argument that any harm to Southwest is compensable via money damages, the Court disagrees. Even with the recent cessation of hidden city ticket sales, Southwest has still shown irreparable injury. Grounds for irreparable injury include loss of control of reputation and loss of goodwill. *See Emerald City Mgmt., L.L.C. v. Kahn*, 624 Fed. App'x 223, 224 (5th Cir. 2015). Southwest has shown that Kiwi's activities are damaging its reputation and goodwill and these damages cannot be quantified.

### *Balance of Harms*

Southwest must also demonstrate the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted. Southwest argues Kiwi's business practices interfere with customer communications, misrepresent Southwest customer-friendly policies,

charge customers unnecessary fees, divert traffic away from Southwest's website, and tarnish Southwest's reputation and goodwill. Southwest argues Kiwi will suffer little if any damage by ceasing unauthorized sales of Southwest flights and that Kiwi's interest in using the Southwest website for its own commercial purposes is entitled to "scant consideration." Kiwi can continue its business and sell flights for other carriers.

Kiwi alleges the balance of harms tips strongly in its favor. Kiwi argues an injunction poses a significant threat to its business model, reputation, and partner relationships. Kiwi asserts removing Southwest flights from its website will drastically affect its ability to build dynamic travel itineraries for its customers. According to Kiwi, for many key travel routes and destinations, it is impossible to fly without traveling on Southwest. It also contends that an unspecified "threat of further injunctions against brokering ticket sales poses a potentially existential threat to Kiwi.com's US operation."

The Court concludes the threatened injury to Southwest if the injunction is denied outweighs the harm to Kiwi. Southwest has shown that Kiwi's unauthorized sales of its flights poses a significant disruption to its customer operations. Kiwi has not convinced the Court that the injunction will significantly threaten its business. As Southwest notes, Southwest is not listed as one of Kiwi's "top 20 airlines" on its website.[1]

### *Public Interest*

The final element is that the public interest will be served by the issuance of an injunction in this case. Southwest contends the public interest is served by an injunction because injunctive relief will protect consumers. It relies on evidence that its customers have been harmed in various

---

[1] *See* https://partners.kiwi.com/technology-services/b2b-partnership-model.

ways by Kiwi's unauthorized sales of its flights, including being deceived and overcharged for services. Kiwi counters that the public interest favors dissemination of public information and competition in the market. It asserts research demonstrates the free-market benefits to the public of online services providing airline price comparisons. The Court concludes the public interest will be served if the preliminary injunction is granted for the reasons put forward by Southwest and because there is an expectation that parties to contracts will honor their contractual obligations.

Southwest has satisfied the four requirements for the issuance of a preliminary injunction.[2] The Court grants Southwest's motion.

### Preliminary Injunction

For the reasons set forth above, the Court ORDERS as follows:

That the Defendants Kiwi.com, Inc. and Kiwi.com s.r.o., as well as their officers, members, managers, affiliates, agents, employees, servants, representatives, any entities owned or controlled by them, and all persons acting under or in concert with them, are preliminarily enjoined throughout the pendency of this lawsuit from: (1) harvesting, extracting or scraping information from the Southwest Website, www.southwest.com, or its proprietary servers, including Southwest's flight and fare information; (2) publishing Southwest flight or fare information on the kiwi.com website, through its mobile applications or elsewhere; (3) otherwise accessing and using Southwest's Website and data for any commercial purpose; (4) selling Southwest flights; and (5) committing any other acts in violation of Southwest's Terms & Conditions.

Federal Rule of Civil Procedure 65(c) provides that the Court may issue a preliminary injunction only if the movant gives "security in an amount that the court considers proper to pay

---

[2] Southwest filed objections to some of the materials in Kiwi's appendix in opposition to the motion for preliminary injunctions (Doc. 35). Because the Court has ruled in Southwest's favor, even with the allegedly objectionable evidence, it denies the objections as moot.

the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Kiwi asks the Court to require a bond of almost ten million dollars. The Court finds that amount excessive and sets a bond in the amount of $10,000. This preliminary injunction shall not become effective until Southwest tenders to the Court the sum of $10,000 cash or bond in a form approved by the clerk of the court. This preliminary injunction shall remain in effect until a trial is conducted on the merits or until it is otherwise modified by the Court.

 **SO ORDERED.**

 Signed September 30, 2021.


Ada Brown
UNITED STATES DISTRICT JUDGE